**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

---

ALEXIS DUCKETT, KRYSTYNA ELLEW,
MARY FERRITO, TESSA GRADY, TARA STAUFFACHER,
TESSA TOWERS,

      Plaintiffs,

      v.                             Case No: 3:25-cv-00684

THE BOARD OF REGENTS OF
THE UNIVERSITY OF WISCONSIN SYSTEM,
JUSTIN DOHERTY in his individual capacity,
MARISA MOSELEY in her individual capacity,

      Defendants.

---

**FIRST AMENDED COMPLAINT**

---

Plaintiffs, Alexis Duckett, Krystyna Ellew, Mary Ferrito, Tessa Grady, Tara Stauffacher, and Tessa Towers, for their Complaint against Defendants, The Board of Regents of The University of Wisconsin System ("UW-Madison" or "the University"), Justin Doherty, and Marisa Moseley, state as follows:

**<u>INTRODUCTION</u>**

1.     This case is about six young women athletes who were psychologically abused by their college basketball coach and the university that failed to protect them.

***The Epidemic of Psychological Abuse in College Sports.***

2.      College coaches abusing their athletes is nothing new. Incidents of abuse appear frequently in the media, and it is broadly recognized that there is a widespread problem of psychological abuse on college teams across the country.[1]

3.      Psychological abuse comes in many forms, but it often involves coaches:

- humiliating and intimidating players;

- denying attention and support to players, including ignoring, isolating, and routinely excluding certain players from activities and coaching guidance;

- bullying and harassing players;

- spreading rumors or lies about players to harm their reputation;

- abusing their power to exercise control over the lives of their players—even off the court;

- manipulating their players to share private information about their lives; and

- engaging in retaliatory and threatening behavior towards players.[2]

4.      The University of Wisconsin-Madison has a history of ignoring reports of psychological abuse involving its coaches. In January 2022, the women's cross-country coach resigned for "family reasons." On the day of her resignation, the University of Wisconsin-Madison tweeted about what a great coach she was. But many current and former runners alleged the coach was psychologically abusive and that the University of Wisconsin-Madison knew about it.

5.      Three runners accused the coach of body shaming, and two others alleged that she forced them to push through injuries. Runners would allegedly leave her office in tears after being

---

[1] U.S. Center for SafeSport, "Emotional and Physical Abuse & Misconduct Toolkit", 2022, V. 1.2, https://eptoolkit.uscenterforsafesport.org/wp-content/uploads/2022/09/Full-EP-Toolkit-V1.2.pdf.
[2] *Id.*

verbally abused and degraded. And because the coach allegedly downplayed certain runners' injuries, the athletes would develop stress fractures because they were not allowed to properly rest and heal. In December 2021, one athlete emailed the University of Wisconsin-Madison's Athletic Director about the coach's misconduct and asked University officials to take action. A University of Wisconsin-Madison Administrator responded that the University was "gathering information" and "inquiring further into the matters." The coach resigned weeks later. In April 2022, an athlete who ran under the coach died by suicide. Her parents believed that one of the causes of their daughter's death was the coach's emotional abuse.[3]

6.      Here are several examples of reported psychological abuse involving other college coaches nationwide:

- In 2014, six former players, two active players, and a former assistant coach said they were psychologically abused by the University of Rhode Island's head softball coach. The women alleged that the coach relentlessly intimidated, threatened, and harassed them, and retaliated against them if they ever spoke up against her. The coach's abuse allegedly caused some players to require therapy and medication and to forfeit their scholarships. Other players allegedly resorted to self-harm, developed eating disorders, and suffered from physical ailments like ulcers because of the abuse. Players said they reported the coach's conduct, but the school swept the reports under the rug.[4]

- In her 2025 documentary on Hulu, popular podcaster Alex Cooper alleged that her head soccer coach at Boston University abused her in the form of inappropriate comments of a personal and sexual nature, and abused her power by conditioning Cooper's playing time on Cooper sharing intimate details about her sex life and spending time alone with her. Cooper says that she and her parents brought documentation of the coach's abuse to the school in 2015, but

---

[3] Badger Extra, *Former Badgers athletes say 2 coaches created a toxic culture, and Wisconsin knew about it,* https://badgerextra.com/sports/basketball/women/former-badgers-athletes-say-2-coaches-created-a-toxic-culture-and-wisconsin-knew-about-it/article_bbe90fae-dc8e-4561-9d71-81cc57ef864d.html#tracking-source=home-trending (July 27, 2025).
[4] WJAR News, *Softball Players, Coach, Say they Were Bullied at URI,* https://turnto10.com/archive/softball-players-assistant-coach-say-they-were-bullied-at-uri (Apr. 16, 2014).

that the athletic director did not look at the evidence and told her she could stay on scholarship but that they would not be firing the coach.[5]

- In February 2025, the University of Akron's head women's soccer coach was placed on administrative leave pending an investigation into concerns about the mental health and physical safety of players. The investigative report detailed the coach's insensitive comments about their weight and name-calling. The report further revealed that 10 out of 17 current or former athletes said they felt pressured by the coach to share personal information "that they felt was not in line with what a Coach would need to know." The athletes "explained that the way in which they [were] asked didn't make them feel like she was asking out of interest in trying to get to know them better, but rather that she was using the information she received to manipulate them or to use against them when it came to their performance on the field." For example, the investigation found that one player said the coach asked one of the athletes' roommates "if she sleeps around." The university fired the coach in May 2025 based on the investigation's findings.[6]

- In April 2025, Clemson University fired its head gymnastics coach for alleged abusive behavior. She was fired for cause for violating the following terms of her employment contract: the "responsible treatment of athletes," "demonstrating concern for [athletes'] welfare," and not engaging in "physical or emotional abuse." [7]

7.     A 2015 investigative report about abuse in college sports found that "[t]he problem is particularly acute in women's basketball." Indeed, former players at Moseley's own alma mater, Boston University, where she both played and coached, alleged that a former Boston University coach engaged in behaviors nearly identical to those of Moseley for years. Said coach allegedly kept Kleenex boxes in her office for players who would inevitably leave one-on-one meetings in

---

[5] Boston.com, *In Hulu Documentary, Alex Cooper Details Alleged Sexual Harassment by BU Soccer Coach: 'I didn't Realize How Much I Had Suppressed,'* " (https://www.boston.com/sports/local-news/2025/06/12/alex-cooper-sexual-harassment-allegations-bu-soccer-coach/) (June 12, 2025).
[6] Cleveland.com, *University of Akron Fires Women's Soccer Head Coach After Investigation of Players' Physical and Mental Health,* https://www.cleveland.com/akron/2025/05/university-of-akron-fires-womens-soccer-head-coach-after-investigation-of-players-physical-and-mental-health.html (May 30, 2025).
[7] Sports Illustrated Online, *Clemson Gymnastics Coach Fired for Cause After Alleged Abusive Behavior*, https://www.si.com/college/clemson-gymnastics-coach-fired-alleged-abusive-behavior (June 30, 2025).

tears. The meetings "were never about basketball," said one of the former players, they were "about who I was… my personality, my relationship with my parents."[8]

8.    The risk of abuse in college sports is foreseeable, and so is the harm that players suffer as a result. For many athletes, the coach becomes an irreplaceable, larger-than-life figure in their lives. College athletes often sacrifice other social networks, outlets, and support systems to give their all to their sport, leaving them vulnerable to a coach's overreaching and influence.

9.    What is more, these young athletes are inexperienced with what appropriate coaching looks like at an elite level. A coach's emotional abuse becomes normalized. And the athletes become stuck and increasingly dependent upon their coach.

10.    Good coaches use their positions of power constructively. Coaches like Marisa Moseley abuse the position—exploiting and manipulating their athletes' dependence upon them, creating a toxic and dangerous environment, and damaging the mental health of student-athletes.

## NATURE OF THE ACTION

### *Marisa Moseley and UW-Madison are Part of this Epidemic of Abuse.*

11.    Marisa Moseley became the head coach of the University of Wisconsin-Madison Women's Basketball Team in 2021. Within her first three years, ***at least 11 players*** either left the program prematurely or transferred to another school. Many of them cited alleged mistreatment by Marisa Moseley as contributing to their decision to leave.

12.    The University, along with Justin Doherty, was aware of these departures and took no remedial or oversight action with regard to Marisa Moseley's conduct.

---

[8] Sports Illustrated Online, *Is the Era of Abusive College Coaches Finally Coming to an End?* https://www.si.com/college/2015/09/29/end-abusive-coaches-college-football-basketball (Sept. 29, 2015).

13.     Moseley, who openly has a long history of mental health issues,[9] touted herself as an advocate for mental health treatment and awareness. However, she unconstitutionally toyed with the mental health of her players, including Plaintiffs, as a means of exerting control over every facet of their lives, including retaliating against them based on their protected speech and expressive acts and discriminating against them based on their disabilities or perceived disabilities.

14.     Specifically, Moseley intruded upon her players' privacy—trapping them in intense, one-on-one meetings in her office on a nearly daily basis, and prying into their personal lives, pressuring them to divulge everything from issues with their parents or romantic partners to their confidential mental health symptoms and treatment choices.

15.     Moseley, who is not a qualified mental health provider, also dangerously interfered with her players' mental health treatment. In one instance, she went so far as to trap Plaintiff Krystyna Ellew, who was experiencing a mental health event, alone in the back of the women's locker room for the majority of the day, threatening to involve the police until she agreed to check into a mental health treatment facility.

16.     Moseley accomplished all of this by abusing her position of power by making threats about scholarships and playing time, and manipulating her players, claiming that she was simply "building trust" with them on and off the court

17.     Moseley endangered the mental and physical safety of her team, including Plaintiffs. Not only was this danger in plain sight, but the University had actual knowledge of the harm facing Moseley's players but failed to act. For example:

---

[9] Wisconsin State Journal, '*Everyone Should Get Therapy', Badgers Coach, Marisa Moseley Isn't Afraid to Talk about Mental Health*, https://madison.com/sports/college/basketball/women/everyone-should-get-therapy-badgers-coach-marisa-moseley-isn-t-afraid-to-talk-about-mental/article_89ef16ee-79d0-5dcb-95bf-ae0202dc700c.html (Feb. 26, 2022).

- Several players and their parents reported Moseley's abuse to Defendant Justin Doherty, the University's Senior Associate Athletic Director for External Communications.

- Doherty was involved with the removal of certain players from the team and participated in events leading to their removal.

- Doherty was aware of or involved in the aftermath of numerous mental health incidents and crises involving Moseley's players.

- Eleven players left Moseley's team within a short time of her becoming head coach with several attributing their departures to her toxic leadership and emotionally harmful conduct.

- Numerous university agents and employees within the University's Athletic Department, including assistant coaches, trainers, and medical providers, witnessed Moseley's psychological abuse and knew about the resulting decline of the athletes' mental health.

- University medical providers treated a disproportionate number of Moseley's players for mental health issues. Several players required emergency medical treatment or treatment at a mental health facility, and many of them were placed on a cocktail of prescription mental health medications by team doctors.

18.     With its young athletes facing a known and compelling danger, the University of Wisconsin-Madison had a duty to intervene to protect Plaintiffs and their teammates, rather than adopting, as it did, a policy of laissez-faire inaction. The University of Wisconsin-Madison had two reasonable options: either immediately remove Marisa Moseley as head coach pending investigation or institute disciplinary or supervisory actions.

19.     That is not what happened. Instead, the University of Wisconsin-Madison punished the athletes for their mental health issues caused by Moseley. Below are some examples of what the University did instead of protecting Plaintiffs and their teammates from foreseeable harm:

- forced certain players experiencing mental health issues off the team, causing at least one player to lose her scholarship and opportunity at a college degree;

- diagnosed players with serious mental illnesses and mood disorders and placed them on numerous prescription mental health medications at the same time,

often switching and adding medications when players continued to struggle under Moseley's coaching;

- penalized players with cognitive disabilities for their mental health and disability-related symptoms; and

- coerced players, following a mental health incident, to sign broad agreements releasing their medical records if they wished to remain on the team.

20.     Plaintiffs suffered severe emotional distress while playing for Marisa Moseley and continue to struggle today. Defendants are responsible for the damages Plaintiffs suffered as a result of Moseley's and Doherty's unlawful conduct. The Board of Regents, as the overseeing entity of the University of Wisconsin-Madison, is also liable for the damages Plaintiffs suffered due to its deliberate indifference to Moseley and Doherty's conduct as it pertained to disability, and failing to protect Plaintiffs from a known and compelling danger.

## PARTIES

21.     Plaintiffs were at all relevant times student-athletes enrolled at the University of Wisconsin-Madison and players on the University of Wisconsin-Madison women's basketball team, for which their respective seasons are set forth below.

22.     Plaintiff Alexis Duckett transferred as a sophomore to the University of Wisconsin-Madison in 2020 and was part of the University of Wisconsin-Madison women's basketball team for the following seasons: 2020-21 and 2021-22.

23.     Plaintiff Krystyna Ellew enrolled as a freshman at the University of Wisconsin-Madison in 2021 and was part of the University of Wisconsin-Madison women's basketball team for the following seasons: 2021-22 and 2022-23.

24.     Plaintiff Mary Ferrito enrolled as a freshman at the University of Wisconsin-Madison in 2022 and was part of the University of Wisconsin-Madison women's basketball team for the 2022-23 season.

25.     Plaintiff Tessa Grady enrolled as a freshman at the University of Wisconsin-Madison in 2023 and was part of the University of Wisconsin-Madison women's basketball team for the following seasons: 2023-24 and 2024-25.

26.     Plaintiff Tara Stauffacher was enrolled at the University of Wisconsin-Madison part of the University of Wisconsin-Madison women's basketball team for the following seasons: 2019-20, 2020-21, 2021-22.

27.     Plaintiff Tessa Towers enrolled as a 17-year-old freshman at the University of Wisconsin-Madison in 2022 and was part of the University of Wisconsin-Madison women's basketball team for the following seasons: 2022-23 and 2023-24.

28.     Defendant Board of Regents of the University of Wisconsin System ("UW Regents") creates the policies and rules governing the University of Wisconsin System, comprised of 13 universities across the State of Wisconsin, including the University of Wisconsin-Madison ("UW," "UW-Madison," or "University"), the University of Wisconsin System's flagship campus.

29.     The University is located in Madison, Wisconsin, and at all relevant times was and continues to be under the direct control and authority of Defendant UW Regents.

30.     UW Regents receives federal funding to support the University of Wisconsin System.

31.     The University's athletic teams participate in the National Collegiate Athletics Association's ("NCAA") Division I, with many of the University's athletic programs competing with other universities in the Big Ten Conference.

32.     Defendant Justin Doherty ("Doherty") was at all relevant times University's Senior Associate Athletic Director for External Communications. According to the University's website, during his tenure, Doherty managed brand communications, marketing, video services, community relations, and facilities branding, while also acting as a liaison to the Big Ten Network. He served as the University administrator for the following men's and women's teams: basketball, track and field, cross country, soccer, and golf. Doherty retired from the University in April of 2025. He was acting in the scope of his employment and under color of law at all times relevant to this Complaint.

33.     Defendant Marisa Moseley ("Moseley"). was at all relevant times the University's head coach for the UW Women's basketball team, which includes the following seasons: 2021-22, 2022-2023, and 2023-2024. Moseley was hired as head coach by the University in March of 2021 and publicly resigned her position in March of 2025 amid public allegations against her which are formally set forth in this Complaint. She was acting in the scope of her employment and under color of law at all times relevant to this Complaint.

## JURISDICTION AND VENUE

34.     The jurisdiction of the court is invoked pursuant to the 42 U.S.C. §1983, 28 U.S.C. §§ 1331 and 1343(a), the Americans with Disabilities Act, as amended by the Americans with Disabilities Amendments Act (together, "ADA"), 42 U.S.C. §§ 12101 to 12213, the Rehabilitation Act, 29 U.S.C. § 794,  and the Constitution of the United States.

35.     Venue is appropriate under 28 U.S.C. § 1391(b), as on information and belief, all Defendants reside in this judicial district. In addition, a substantial part of the events giving rise to this claim occurred in this judicial district.

## FACTUAL ALLEGATIONS

***Universities Have a Duty to Protect Student-Athletes, Particularly Disabled Athletes or Athletes Perceived to be Disabled, from a Coach's Psychological Abuse.***

36.     A coach's psychological abuse endangers the mental health of college athletes. Universities have a duty to take reasonable steps to protect their athletes' mental health and also to protect them from abusive, discriminatory, and retaliatory coaches.

37.     The NCAA, of which the University is a member, has focused on the mental health of college athletes since 2013. In 2016, the NCAA Committee on Competitive Safeguards and Medical Aspects of Sports' Mental Health Advisory Group ("MHAG") released an inter-association consensus document" titled "Mental Health Best Practices: Understanding and Supporting Student-Athlete Mental Health" ("Best Practices Document").[10]

38.     Member schools of the NCAA "are legislatively required to make mental health services and resources available to their student-athletes consistent with [the Best Practices Document]."

39.     The Best Practices Document is informed by expert and consensus-based recommendations from the MHAG, which consists of over 30 representatives from scientific, medical, sports medicine organizations, and all divisions of the NCAA membership. The MHAG identified "core components" that are the "most necessary for schools to comply." Some core components are:

- "Mental health is an important dimension of overall student-athlete health and optimal functioning."

- "Emerging adulthood is a particularly important time for supporting mental health."

- "Coaches play an important role in student-athlete mental health and well-being."

---

[10] NCAA, *Mental Health Best Practices: Understanding and Supporting Student-Athlete Mental Health*, https://ncaaorg.s3.amazonaws.com/ssi/mental/SSI_MentalHealthBestPractices.pdf (copyright 2016, revised 2020, updated 2024).

- "Mental health and physical health are inextricably linked."

- "Discrimination, maltreatment, and psychosocial trauma negatively impacts mental health."

40.    Importantly, coaches are not permitted to interfere with their players' medical or mental health treatment or care.

41.    In 2016, the NCAA approved new rules requiring sports medicine staff to have "unchallengeable authority" over student-athletes' medical treatment. Indeed, according to an NCAA briefing document, "[t]he coach must be completely decoupled from medical decision-making."[11]

42.    It is the overseeing institution's job to enforce that rule. Specifically, institutions like UW-Madison have a duty to monitor that coaches are not influencing or interfering with their athletes' medical or mental health treatment or decisions. This duty includes:

- monitoring coaches to ensure they are not coercing student-athletes to sign agreements releasing their medical and mental health records to the University;

- overseeing coaches to keep them from pressuring students to take certain medications or undergo specific treatments;

- ensuring that coaches are not abusing their positions of power to threaten students into divulging personal information about their mental health, medications, or therapy sessions; and

- preventing coaches from interfering with decisions surrounding students' medical or mental health treatment, as those decisions must be between students and their mental health providers.

43.    Regarding medical release agreements, universities have a duty to prevent and stop coaches from making threats about playing time or scholarship eligibility to coerce student-athletes

---

[11] Espn.com, *Documents, Claims, Bring NCAA Medical Care Issues Into Question*, https://www.espn.com/espn/otl/story/_/id/28116817/documents-claims-bring-ncaa-medical-care-issues-question (Nov. 26, 2019).

to authorize the broad release of their personal health information. The coach should not be involved in presenting these contracts to students, the student's decision whether to sign, or placing conditions on that decision.

44.     This is why member schools must follow the Best Practices Document to offer licensed providers who "oversee and manage" student-athlete mental health care. And it is up to the school to:

- ensure that "student-athletes with mental health symptoms" are evaluated and treated by "*qualified mental healthcare providers acting within the scope of their clinical licensure*";

- offer student-athletes a "choice of provider in the care process," being especially mindful of the "value of accessible providers" for students who may have disabilities; and

- maintain the *privacy of student-athletes with mental health symptoms*.

45.     Along those lines, college coaches, who are not trained mental health providers, should not act unilaterally or according to their own whim or experience when faced with a player experien6ing a mental health concern or crisis.

46.     Accordingly, the Best Practices Document encourages schools to develop mental health "action plans." Specifically, schools should develop "written action plans for routine and emergent mental health care needs." These action plans should include:

- when and how student-athletes are referred for mental health care, including for evaluation, ongoing treatment, follow-up, and re-entry when indicated;

- who is involved in the identification, referral, and care processes;

- well-defined considerations for what constitutes a routine or emergency mental health condition; and

- a post-crisis plan that takes into account what the CDC calls "suicide contagion," or the process by which suicide or suicidal behaviors influence others.

47.    Mental health treatment and treatment plans are not one-size-fits-all. Many student-athletes will join the team with physical or cognitive disabilities, and the school and coaches must provide those athletes with reasonable accommodations. As the Best Practices Document explains, "[consulting] disability services" will help schools and coaches gain a "better understanding [of] how disability-related accommodations or more accessible practices may mitigate the impact of mental health symptoms and disorders."

48.    For students who come to the team without a diagnosed disability but later become depressed or anxious, disability services should also be consulted "to determine a reasonable accommodation or advise on more inclusive and accessible strategies."

49.    According to the National Association of Basketball Coaches (NABC), of which the University is a member, institutions and their athletic directors must "take responsibility" and be "proactive in identifying, preventing, and eliminating abusive behaviors from their sport programs." Indeed, "[just] as student-athletes are expected to display respect, sportsmanship, and work ethic, administrators should be held accountable for creating a positive, athlete-centered sport environment."[12]

50.    Universities must take the following reasonable steps to protect athletes from the foreseeable harm of an emotionally abusive coach enabled by a university's own widespread and unlawful customs and practices:

- regularly observe and evaluate athletic coaches on pre-determined expectations and provide student-athletes with opportunities to provide feedback;

- train coaches on proper boundaries and mental health risks in college sports;

- pay attention to red flags of team dysfunction;

---

[12] *NABC Code of Ethics*, https://nabc.com/ethics/#:~:text=Coaches%20treat%20all%20persons%20with,their%20direction%20do%20the%20same (provided to new NABC members and re-distributed annually to all active members).

- create and inform student-athletes of reporting procedures related to suspected abuse; and

- provide opportunities for coach education and create a department-wide culture based on an established mission statement, vision, and core values.

### *Moseley Psychologically Abused Plaintiffs.*

<u>Moseley's Psychological Abuse Violated Constitutional Privacy Law.</u>

51.     Moseley intruded upon Plaintiffs' privacy in violation the United States Constitution. She abused her position of power to intrude upon Plaintiffs' personal lives outside of basketball. She also intruded upon Plaintiffs' medical and mental health autonomy.

52.     Moseley's intrusions violated Plaintiffs' health and informational privacy, both of which are protected by the Fourteenth Amendment of the Constitution.

<u>Moseley intruded upon Plaintiffs' personal lives under the guise of "building trust."</u>

53.     Moseley told her players that if they wanted to play, she needed to trust them. In order to trust them, Moseley and her assistant coaches, acting on her behalf, insisted that players share intimate details about their personal lives with her.

54.     For example, at the beginning of the 2022-23 season, Moseley held a team meeting with staff and players. Everyone sat in a circle, and Moseley and another person whom Moseley had invited to lead the group prompted each person in the circle to share something deeply personal and vulnerable with the group, as a way to bond with each other. The players and staff members did what they were told—manipulated into believing that doing so would allow them to bond with the team and their coaches. Cornered, they shared examples of childhood traumas, deaths, mental health difficulties, and relationship problems in their families. Players were in tears and re-traumatized.

55.    Also, at the beginning of the 2022-23 season, Moseley reviewed the team handbook with players. The handbook contained a section prohibiting players from engaging in sexual relations with each other. Doing so constituted a punishable offense. All players were required to sign the handbook. Not only does a policy (and enforcement of the policy) outright banning intra-team dating intrude upon the privacy of college athletes, but it also discriminates against gay players, who would not be punished for doing the same with an athlete of the opposite sex. Moseley told her players that she was fine with them engaging in "bestiality" as long as they didn't have sexual relations with their teammates. The handbook itself violated policies.

56.    At the end of the 2021-22 season, Moseley provided her players with questions to answer and come prepared to discuss with her. The questions were personal and inappropriate, forcing players into awkward situations, including requiring them to describe which teammates they have the best and worst relationships with, and why.

57.    Moseley also invaded her players' personal lives by insisting that they come to her office on a nearly daily basis for intense, one-on-one meetings. Assistant Coach Doty directed players to visit Moseley's office every day and spend time talking to her in order to "gain Moseley's trust." Doty would text players, reminding them to stop by Moseley's office and check in with players when they didn't do so.

58.    During these frequent one-on-one meetings, Moseley pressured her players, including Plaintiffs, to share intimate details about their lives that had nothing to do with the sport because, according to her, that's how a player and a coach come to trust each other.

59.    For example, Moseley pressured a former player to divulge information about her family, therapy sessions, and personal life. When she told Moseley about issues with her father,

Moseley went so far as to contact him—without the player's knowledge or consent—to discuss their relationship. This player was one of many who left the program because of Moseley.

60.     During her one-on-one meetings with Plaintiff Krystyna Ellew, Moseley repeatedly told her how much she "cared about her" before probing into her romantic relationships and her relationship with her family. The meetings continued even into the summer break. While Moseley made her deeply uncomfortable, Krystyna did not have any experience with college coaches and believed that she had to share private details about her personal life to gain Moseley's trust in order to play.

61.     Moseley did the same to Plaintiff Mary Ferrito, digging into her romantic relationships and private life. During their frequent one-on-one meetings, Moseley asked Mary for details about her friendship with her teammate and roommate, who was struggling with her own mental health issues. Moseley policed that friendship and pressured Mary to stop being so close with her roommate.

62.     Similarly, Moseley interrogated Plaintiff Alexis Duckett about everything from her then-boyfriend to the intricacies of her relationship with her father—a particularly sensitive and personal subject for Alexis.  In an attempt to protect her mental health, Alexis tried to distance herself from Moseley—sharing less and less about her personal life and avoiding her office. As Assistant Coach Doty told Alexis, Moseley did not like her attempts to distance herself and reduced her playing time as a result.

63.     Likewise, Moseley trapped Plaintiff Tessa Towers in her office to pry into her physical relationships, including, for example, asking her if she was engaged in sexual relations with her then-girlfriend.

64.    By insisting that players expose their vulnerabilities and reveal private details about their lives having nothing to do with basketball, Moseley intentionally created an environment where players, without strong social ties outside of the team, began to rely on and become dependent upon Moseley. This was toxic and allowed Moseley even further control of her players. On one occasion, Plaintiff Mary Ferrito was berated by Moseley and assistant coaches for breaking a handbook rule that she did not break. Afterwards, Mary had a panic attack in her dorm room, and her teammates asked her what they could do. Because of the toxic dependency Moseley created with her players, Mary asked her teammates to call Moseley, who came to Mary's room and comforted her until she calmed down. Mary found comfort in even the slightest kindness offered by her abuser.

65.    Moseley also invaded Plaintiffs' personal lives by intentionally isolating them from their parents and other relationships outside the team. Players were therefore left with virtually no support system outside of the team.

66.    For example, Plaintiff Tara Stauffacher had the small but meaningful ritual of "air-fiving" her parents in the stands before games. During one game in the 2021–2022 season, Moseley taunted Tara about this—mocking her by saying that it was Moseley, not Tara's parents, who made decisions about playing time and ordering her to stop engaging with her parents, even before games. At halftime, in front of the entire team, Moseley told Tara that she should stop talking to her parents because they would not help her position on the team. Moseley had such control over her players on and off the court, that her commands worked. Tara, afraid Moseley would find out if she spoke to her parents, felt she had to distance herself from her parents. Before that point, she spoke to her parents nearly every day, and not only about basketball. By cutting off Tara's healthy support systems outside of the team, Moseley wedged herself further into Tara's life. As a result

of Moseley's psychological abuse, Tara suffered severe emotional distress and, to this day, continues to experience panic attacks, flashbacks, and anxiety.

67.     As another example of intruding into Plaintiffs' personal lives, Moseley approached the coach of Tessa's then-girlfriend, who was a student-athlete at UW–Madison and expressed her negative views about Tessa. The coach then echoed these concerns to Tessa's then-girlfriend about Tessa's character.

68.     Similarly, Moseley intruded upon Plaintiff Tessa Grady's relationship with her girlfriend, who was also on the team. She would talk to Tessa Grady and her then girlfriend about their relationship and ask them whether they argued. On one occasion during Tessa's sophomore year, she even suggested to Tessa's girlfriend that they roleplay that Moseley was Tessa and that the girlfriend attempt to set  boundaries with her.

        Moseley intruded upon Plaintiffs' medical and mental health autonomy and rights.

69.     Moseley, without permission, or the appropriate qualifications, interfered with her players' mental health treatment. She believed, as their coach, she was entitled to do so for what she viewed as the betterment of the team.

70.     One of the most troubling examples of this took place during the spring of Krystyna Ellew's freshman year. At that time, Krystyna was experiencing worsening mental health symptoms because of Moseley's intrusion into her life and psychological abuse. Moseley observed these symptoms one evening and unilaterally decided that Krystyna needed to go to a mental health treatment facility. And if she would not go voluntarily, Moseley would call the police.

71.     Without any meaningful choice in the matter, Krystyna went to a treatment facility for one day. Krystyna, however, did not believe that she needed to be at the facility, and her treating mental health providers agreed. After Krystyna left the facility, Moseley took her to the women's

locker room and placed her in a back room. Moseley put a sign on the door directing others to stay out.

72.     Despite her pleas that she felt trapped and wanted to leave, Moseley kept Krystyna in that room for the majority of the day. She was given two chairs to use as a bed. Moseley threatened to call the police if she tried to leave.

73.     Ultimately, Krystyna returned to the facility, where Moseley proceeded to visit her every day. Moseley came so often that she drained Krystyna's available visitor hours, preventing other visitors from seeing her.

74.     After her hospitalization, Krystyna began taking mental health medications. When she complained about side effects, Moseley, instead of involving her providers, told her to persist on her medications despite her discomfort, insisting, "the longer it takes for you to get consistent on medications, the longer it will take for you to be consistent on the team."

75.     Moseley also used one-on-one meetings to play therapist with her players. For instance, Moseley questioned Plaintiff Alexis Duckett about any mental health symptoms, and when Alexis shared that she experienced stress and anxiety, Moseley saw an opportunity to insert herself further—repeatedly telling her to go on prescription mental health medications because they "helped Moseley"—despite Alexis's insistence that she did not want to take medication.

76.     Similarly, during a meeting with Tessa Grady that was supposed to be about Tessa's academics, Moseley told Tessa that she should get tested for ADHD. Moseley was unqualified to do so, and she abused her position of power to interfere with Tessa's medical and mental health autonomy.

77.     Another one of Moseley's harmful patterns was to abuse her position of power to coerce her players to sign agreements authorizing the release of all medical and mental health

records to the University. Moseley should not have had any involvement in those decisions or processes, but she pressured Krystyna and Tessa to sign the agreement threatening to remove them from the team if they refused.

### *Moseley Abused her Authority to Control Plaintiffs by Demanding that They Contact her in the Event of an Emergency, even before Contacting Authorities.*

76.    Moseley used the information she coerced from Plaintiffs in an attempt to make them dependent upon her and exert control over their lives both on and off the court.

77.    One way she did this was by demanding that all players contact her first in the event of any emergency.

78.    For instance, in August 2022, Plaintiff Mary Ferrito's teammate and roommate suffered a severe mental health crisis involving self-harm. Another teammate, who was present with Mary and the roommate, appropriately called 911. Mary accompanied her roommate to the hospital. When Defendant Moseley learned of the incident and arrived at the hospital, she berated Mary for not contacting her first. Moseley then threatened Mary, warning that if she failed to report any future incidents directly to Moseley before notifying anyone else, her future on the basketball team would be in jeopardy.

79.    A few months later, Mary found her roommate injured in their dorm room after another act of self-harm. Her roommate panicked and begged Mary not to call 911 or notify Coach Moseley, fearing further retaliation for having a mental health crisis. Aware that Moseley might punish both her and her roommate for involving emergency services, Mary was forced into an impossible position: protect her friend's safety or risk retaliation from Moseley. Eventually, another teammate contacted an assistant coach, who then called for an ambulance. When the ambulance arrived, Mary's roommate refused to get in, insisting instead on taking an Uber to the

hospital to avoid angering Moseley. Moseley arrived at the hospital; she again reprimanded Mary for not notifying her first and accused Mary of betrayal.

80.     Mary's roommate was then treated at a residential mental health facility. Moseley ordered Mary and another teammate not to visit her at the facility. When Mary's roommate asked her to bring clothes and a book to the facility, Mary chose her friend over Moseley. Moseley continued to reprimand her for that choice.

***Moseley Targeted Certain Players Because of Their Disabilities or Perceived Disabilities.***

81.     Moseley also bullied and singled out certain players, including Plaintiff Tessa Towers, based on their disabilities. Tessa was not the first player Moseley targeted for this reason. Both Moseley and Doherty routinely failed to support student-athletes with disabilities and refused to provide reasonable accommodation or modification.

82.     Other players with known disabilities were also on the team, and Moseley was aware of their conditions.

83.     Neither Moseley nor the University learned its lesson. In 2022, when 17-year-old Tessa Towers joined the team, she disclosed her ADHD diagnosis and medications as required by NCAA policies.

84.     Because her stimulant ADHD medication that she had been on throughout her adolescence reduced her appetite, she was taken off that medication so she could bulk up. University providers placed Tessa on *11 new medications in less than a year*.

85.     Unsurprisingly, Tessa experienced side effects from the cocktail of new medications, and all the while, Tessa was left without proper, reasonable accommodation or modification to get her through this transition.

22

86.     Moseley viewed Tessa as a burden. Instead of working with disability services to determine how to best accommodate Tessa's disability, Moseley grew frustrated with her for reasons beyond Tessa's control. She singled Tessa out, yelling at her during practices, and triggering her ADHD symptoms, overstimulating her, and sending her into fight-or-flight mode.

87.     Tessa's mental health foreseeably deteriorated. By October 2022, Tessa had already been hospitalized twice for self-harm.

88.     Instead of changing her behavior, or working with disability services, Moseley punished Tessa for her mental health incidents. She isolated her—threatening players not to be friends with her or visit her in the mental health treatment facility. Tessa's teammates found Moseley's behavior towards their friend and teammate disturbing. Her teammates knew about Tessa's ADHD, and they watched their coach bully her because of it. Then, as they witnessed Tessa's mental health problems escalating in multiple crises, they observed their coach's behavior grow even worse. They could do nothing about it since Moseley threatened to reduce their playing time if they visited Tessa in the mental health facility or continued their friendships with her.

89.     In the summer after her tumultuous freshman year, Moseley punished Tessa again—placing her on a "3 Strikes" plan. Under the plan, even the slightest infraction could lead to Tessa's removal from the team. Tessa's mental health providers, including at least one who worked for the University, were against this strategy and found it harmful to Tessa. However, the University provider did not intervene. Tessa lived in constant fear and anxiety that she would do something wrong and be kicked off the team. Moseley told Tessa that it would be good for her to have this anxiety placed upon her throughout the season. Minor mistakes, like submitting a document outlining her goals one day late, resulted in a strike for Tessa.

90.     Tessa and Krystyna were punished for their mental health problems caused by Moseley. During the 2022-23 season, Tessa and Krystyna were prohibited from attending a team trip because of their mental health. Tessa and Krystyna's psychiatrist disagreed with this decision and thought they should have been able to attend. They each learned about this decision a week before the trip. After Tessa was informed, she could not travel with her teammates, Moseley called Tessa to her office, where she questioned Tessa relentlessly about how the decision made her feel, and whether she was angry with her about the decision.

91.     Moseley also targeted players with perceived disabilities. For example, Moseley scheduled a meeting with Tessa Grady to address Tessa's grade in freshman math. But Moseley used the meeting to berate Tessa about her basketball performance and concluded the meeting by telling Tessa that she should get tested for ADHD. Tessa, who does not have ADHD, but was simply adjusting to the transition from high school to college academics, was already working with a learning specialist through the University. Moseley used and abused her position of authority by inappropriately targeting a player she perceived as disabled,  and making off-hand, discriminatory comments about what she perceived to be that player's learning disability.

92.     Moseley was insensitive to her players' disabilities and mental health problems and made crude remarks like telling another player, who also engaged in self-harm behaviors, to stop spending time with Tessa because the two of them were competing for the most self-harm scars and egging each other on. Similarly, during one practice in 2024, Moseley told the team that she "didn't want to hear that 'I was in my head' b******t anymore" because being in your head "is a made-up thing and it's not real," reflecting her negative attitude towards her players' perceived or actual mental health conditions. During another practice that same year, Moseley told the team she "didn't give a f*** what's going on outside of this gym."

***Moseley Retaliated Against Players She Struggled to
Control, Often Based upon Constitutionally Protected Speech.***

92.     When Moseley sensed that her control over her players was slipping, she retaliated. When the NCAA changed the rules on "Name, image, and likeness" (NIL), Alexis's social media presence began to grow. Moseley did not like these external influences and told Alexis to make her social media profiles private. Alexis refused as was her right. Moseley retaliated by homing in on Alexis's weight, telling her that "her ass was getting too small." Alexis, whose strength numbers and tests surpassed some of her bigger teammates, attempted to explain that she was just naturally thin, but Moseley would have none of it. Moseley referred her to a sports nutritionist, who said she was healthy and suggested simply adding a banana to her daily diet. Still, Moseley, who is not a nutritionist, required Alexis to sit with one of the team's trainers (also not a nutritionist) during meals. Moseley directed the trainer to dictate what was on Alexis's plate and to ensure that she cleared her plate.

93.     Alexis began experiencing panic attacks and other mental health concerns as a result of Moseley's abuse. She wanted to play basketball but could not take playing for Moseley any longer.

94.     After her junior year, Alexis requested a medical discharge. She was eligible because she had suffered multiple concussions and knee surgeries over the last two years playing college basketball. A medical discharge would allow her to leave the team but maintain her scholarship. Defendant Doherty indicated Alexis's injuries would qualify her for a medical discharge.

95.     However, the decision to grant Alexis a medical discharge was Moseley's, though, and she refused. In doing so, Moseley doled out the worst punishment possible—taking away Alexis's opportunity for a college degree at the University. Since Moseley refused to grant Alexis

25

a medical discharge, Doherty presented Alexis with a form in the spring of 2022 indicating she was leaving the program voluntarily. Doherty texted Alexis frequently—not to check in about her mental health, which he knew was suffering, but to ask her if she had signed the form yet. Alexis could not risk her well-being any longer, but she also could not afford to stay in school without her scholarship, so she left college after her junior year. Moseley and the University robbed her of a college degree.

### *Moseley Bullied Her Players.*

96.     Moseley's psychological abuse also took the form of bullying. She belittled and humiliated her players and also spread false rumors about certain players in order to isolate them and pit them against each other.

97.     For instance, during one-on-one meetings with players, Moseley told her players negative things about Plaintiff Tara Stauffacher, and during her meetings with Tara, lied about things her teammates said about Tara. Moseley intentionally caused the Plaintiffs, including Tara, to hesitate in confiding in their teammates. This isolated Plaintiffs and made them further dependent upon Moseley.

98.     After losses, Moseley kept players, including Plaintiffs, in her office until they could explain what went wrong during the game. Eventually, players would come up with a reason for the team's loss so they could escape Moseley's office. These meetings almost always ended with players in tears.

99.     Moseley berated Plaintiffs and their teammates during practice, creating a miserable environment in which it was common to see players in tears both before and after practice. Plaintiffs dreaded practice and grew to hate the sport they once loved.

100.    Additionally, Moseley belittled and humiliated certain players. For example, she singled out Plaintiff Tessa Grady and her then girlfriend, who was also on the team. Tessa and her girlfriend made sure to keep their relationship separate from basketball—especially because they knew about Moseley's disdain for intra-team relationships. Yet Moseley attempted to humiliate the two, such as by stopping practice during the middle of the drill and separating them even if they were simply standing next to each other during the drill at the time.

101.    Tessa began experiencing frequent panic attacks and insomnia as a result of Moseley's mistreatment. Tessa began hating basketball and developed severe anxiety requiring medication and therapy. Her anxiety got so bad that she would frequently throw up in the morning before practice. She began seeing the team therapist, who shared with Tessa that she was not the only one on the team struggling because of Moseley.

102.    Moseley also mocked Plaintiff Mary Ferrito because she was a walk-on player—despite representing to Mary during recruitment that she would have the opportunity to play. Mary would not have attended the University if it weren't for Moseley's promise of the chance to play. Mary was heartbroken, as it had been her dream to play for UW-Madison. Another example of Moseley belittling and humiliating Mary occurred during a purported team activity in which Moseley provided each team member with an index card highlighting specific goals related to gameplay. Mary's card, however, stated that her job was simply to be a good teammate and focus on ball defense to enhance the skills of her teammates. Her card made it abundantly clear that she would not be playing. Moseley had the players go in a circle and read their cards out loud. Mary, who was already constantly humiliated by Moseley for her status as a walk-on player, felt belittled and worthless, but she was determined to do her job and be a good teammate. During a game, one of her teammates tore her ACL, and she wiped the tear-stained mascara from her injured

27

teammate's face. Moseley witnessed Mary's act of kindness and confronted her, yelling cruelly at her to stop, claiming the player was fine.

103.    Mary had to deal with Moseley's cruelty on top of her threatening and intimidating behavior surrounding her roommate's mental health. Foreseeably, Mary's mental health suffered. University providers placed her on prescription mental health anxiety medication to manage her mounting anxiety, panic attacks, and insomnia caused by Moseley's mistreatment and the University's deliberate indifference.

104.    In 2022, at the end of her freshman year, Mary approached Moseley about her role on the team, and Moseley responded that she "was never going to play here." Mary decided to transfer to another school so that she could protect her mental health and take back the opportunity to play the sport she loved.

***Moseley Psychologically Abused Plaintiffs as a Coaching Tactic to Bring Home Wins for UW-Madison.***

105.    Moseley's psychological abuse occurred in the scope of her employment for UW-Madison, as she psychologically abused Plaintiffs as a coaching tactic.

106.    Moseley's tortious conduct allowed her to exert her control and authority over Plaintiffs to, in her view, promote the team's cohesiveness, trust, and success.

107.    Moseley acted with the perverse incentive to maintain UW-Madison's reputation in the athletic community and bring home wins for the University, which in turn allowed the University to recruit talent. Once these recruits, like Plaintiffs, landed their dream of playing at UW-Madison, or received scholarships to attend UW-Madison, then they had to endure sustained psychological abuse at the hands of their coach.

***Moseley's and Doherty's Conduct—along with Their and the University's Deliberate Indifference—was Continuing in Nature.***

108.    Moseley's psychological abuse, and Doherty's condoning of and participation in that abuse—along with Defendants' retaliation, discrimination, privacy violations, denial of access to federally funded programs or activities, and failure to accommodate disabilities—were part of a continuing and ongoing practice directed at each Plaintiff. The last act evidencing this continuing practice falls within the statutory limitations period, rendering all of the Defendants' conduct at UW-Madison from 2021 through the summer of 2024 actionable as a continuing violation.

109.    Moseley's psychological abuse, as detailed, as well as Doherty's and other University officials' deliberate indifference towards Plaintiffs' suffering and deteriorating mental health, constituted a systematic pattern they repeated day after day and year after year. Each instance of abuse and neglect was part of an unbroken sequence of events causing Plaintiffs to suffer severe emotional distress.

110.    At no point during the course of Moseley's and Doherty's conduct was there a cessation or meaningful break in this pattern of behavior.

111.    The University's deliberate indifference was also unchanged during the entire course of conduct described herein.

112.    In other words, the offending conduct was not discrete or complete upon occurrence, but instead formed a continuing violation, the last of which occurred within the applicable statute of limitations period.

### *Moseley's Psychological Abuse Endangered Plaintiffs.*

113.    Moseley did not simply cause Plaintiffs' emotional distress—Plaintiffs developed severe mental illnesses, placing them at risk of physical harm.

114.    For example, when Tessa suffered physical injury due to self-harm, Moseley only heightened the risk of harm by repeatedly intimidating and threatening players to contact her first in the event of an emergency.

115.    It was reasonably foreseeable that a team comprised of numerous young, vulnerable players, many of whom were suffering from mental health issues, taking psychiatric medications for the first time, and some of whom required emergency or prolonged psychiatric treatment—was at serious risk, particularly under a leadership style that ignored or punished signs of distress. This was a particularly acute risk given the University's knowledge of the Individual Defendants' actions and histories.

116.    It is reasonably foreseeable that coaches endanger their players when they abuse their positions of power by interfering in their players' mental health treatment and decisions. Coaches are not therapists or doctors, and they place their players' well-being at risk when they attempt to assume that role and influence players' decisions about their treatment or insert themselves into their care.

117.    The same is true when coaches exert their authority to pressure students to sign an agreement releasing their medical and mental health records to the institution.

118.    Plaintiffs and their teammates faced a compelling danger under Moseley's coaching.

### The University Knew that Moseley Placed Her Team in Danger.

119.    Within a short period of time after Moseley became head coach, at least eleven players left the team because of her. That fact alone was a major red flag of dysfunction on the team.

30

120.    Additionally, University providers prescribed numerous players mental health medications. Even with rules on confidentiality, University providers had a duty to report suspected abuse or concerns that students were in potential danger. As these providers were aware, at least two players received treatment at mental health facilities, and several players engaged in self-harm behaviors, one of whom was hospitalized as a result. These providers knew that many of Moseley's players were seriously struggling.

121.    Defendant Doherty knew that many players were leaving for reasons related to their mental health and Moseley's coaching. He also knew that players with documented disabilities were suffering on Moseley's team. In fact, Doherty was involved with the decision to either remove or force many of Moseley's players off the team. He knew there were major problems on the team and that the mental health of many athletes was at risk. However, it was his job to manage the University's reputation and brand, and he prioritized that job over his duty to protect the well-being of the students.

122.    Doherty knew Moseley discriminated against players with disabilities.

123.    Doherty took no remedial action in response to this pattern of discrimination. Doherty, instead, ratified it and participated in it.

124.    Doherty knew about Moseley's difficulties with and discrimination against players with disabilities. In October 2022, following her hospitalizations for self-harm, Tessa was presented with an agreement that let her know her scholarship and place on the team were at risk. The agreement outlined behavioral expectations that were impossible for Tessa to meet because the University failed to provide appropriate accommodations or modifications and, instead, singled her out for discipline solely based on her disabilities. Notably, only Tessa, Doherty, and Moseley signed the agreement—no medical or disability services personnel were involved.

125.    In the spring of 2022, Alexis Duckett sent Doherty an email describing Moseley's abusive coaching tactics.

126.    In March 2022, Doherty asked Alexis to meet with him. The two of them met in the stands of the Kohl Center, and Alexis described the stress of playing on Moseley's team, which led her to see a therapist. Alexis told Doherty that Moseley should not be the leader of these women. Doherty told her he would take care of things.

127.    That same day, Alexis had a meeting with Moseley per Moseley's request. Doherty and the assistant coaches attended the meeting. Moseley raised her alleged issues with Alexis, and Alexis broke down—telling Moseley that she used to believe everything Moseley had done, including, for example, requiring the trainer to eat meals with her, and pressuring her to share personal information about her life with Moseley, was in her best interest. Alexis explained that after having time to reflect and after confiding in her parents, she realized Moseley had been manipulating her all along. Moseley responded that it was her parents who were manipulating her. Doherty did not say anything during this meeting.

128.    Shortly thereafter, on March 25, 2022, Doherty asked Alexis to meet in his office. At that meeting, Doherty provided Alexis with the form indicating she was leaving the team voluntarily. Alexis did not sign on the spot and instead took the papers home to review and think about what to do. Doherty then began texting her. But he was not reaching out to see how she was doing, considering that she was at risk of losing her scholarship and was plainly unwell under Moseley's coaching, but instead, to see if she had signed the form yet. Alexis felt pressured by Doherty, and ultimately, she signed the form—forfeiting her scholarship and college degree.

129.    In April 2022, Plaintiff Tara Stauffacher and her father met with Doherty. During the meeting, Tara told Doherty that the players on the team were miserable and frequently cried

before games and practices. She explained that she believed Moseley was intentionally pushing out specific players. Additionally, she gave Doherty an example of psychological abuse—that Moseley constantly mocked an international teammate for being homesick. That player eventually left the team and returned to her home country.

130.    Doherty told Tara that unhappy players should report any complaints on the "anonymous" end-of-season form provided by the University to players. It is an unspoken secret among UW-Madison athletes that the form is anything but anonymous. The form requires information like the player's year, transfer status, position, playing time, and details of specific incidents. Players are easily identifiable, and with a retaliatory coach like Moseley, were understandably reluctant to make complaints about her on the form. Tara told Doherty during this meeting the forms weren't actually anonymous.

131.    Moreover, the complaint process requires athletes to go through numerous steps, including potentially discussing the issue with the staff members they are accusing of abuse, before their complaint is officially considered a formal complaint.

132.    This complaint process is deficient by design, a reflection of the University's failure to protect participants in its athletics programs.

133.    Additionally, Moseley's conduct was so unbearable that many players, like Tara, endured severe emotional distress and transferred after just one season under Moseley. Given this, there was little incentive for individual players to complete these "anonymous" forms.

134.    Doherty's response to Tara was the same and deeply unsatisfying: because she hadn't written down her complaints against Moseley, there was simply nothing he could do.

135.    After abuse allegations against Moseley surfaced in the media, and Moseley resigned, citing "personal reasons," Doherty was the one to issue a statement on behalf of the

University. He commented that the University was "aware of" the allegations and would "be looking into this matter." He went on to say, "[w]e care deeply about the mental well-being of all of the student-athletes on our teams, during and after their time on campus. While we would like to share additional context around [former player's] comments, federal privacy laws prohibit us from publicly addressing the health-related claims made on [her] social media account."

### *UW-Madison was Deliberately Indifferent and did not Protect Plaintiffs from Risks from a Known and Compelling Danger.*

136.    As described, Moseley's constant, years-long psychological abuse and discrimination endangered her players, including Plaintiffs. The danger was so certain that without the University's involvement, an injury would almost certainly occur.

137.    In fact, that is what happened. The University failed to intervene, and Plaintiffs suffered serious mental illnesses resulting in a myriad of prescription mental health medications prescribed by University providers, multiple self-harm incidents requiring emergency medical treatment, and acute psychological events resulting in treatment at a residential facility.

138.    The University had an obligation to immediately respond to these dangers. The University's only choice, given the imminence of the risk facing the young athletes, was to suspend Moseley pending a thorough investigation because it was not safe for Moseley to remain coaching student-athletes.

139.    The University breached its duty by failing to take any action at all despite the known and present danger facing its students.

140.    In the spring of 2024, a former player who decided to transfer because of Moseley emailed Doherty and other officials in the athletic department about Moseley's toxicity.

141.    In January 2025, Plaintiff Tessa Grady, along with her parents, met with Doherty. Tessa's parents brought with them an article about a UW-Madison athlete who had committed

suicide. Tessa reported her concerns about Moseley, particularly about how her teammates' mental health was suffering because of Moseley's mistreatment. Doherty told Tessa to make a formal complaint and handed her a folder of paperwork. He also said that other players had also previously said that Moseley's conduct impacted their mental health. Later that day, Tessa met with Doherty and the women's basketball coaching staff, including Moseley. Tessa told them that she needed to transfer to another program to protect her physical and mental health and that she had written a letter to the Athletic Directors and coaching staff about her experiences on the team. Moseley responded, "so you're trying to get me fired?" .

142.    In her letter, Tessa described Moseley's psychological abuse that she witnessed during her time playing for the University. She detailed how Moseley coined a derogatory nickname for an Indian American player— "spicy tikka chicken masala." Moseley used the slur often and in front of the entire team. Tessa also described the ways in which Moseley humiliated and psychologically abused her teammates and how her own mental health deteriorated to the point of physical illness. Moseley and Doherty were among those that received the letter.

143.    If it weren't for a former player coming forward publicly about the abuse, it is likely Moseley would still be endangering students at UW-Madison today.

144.    The university had notice and knowledge of the discriminatory treatment and other illegal acts by Defendants Moseley and Doherty and failed to act.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Substantive Due Process**
**(Health and Informational Privacy)**
**(Alleged by all Plaintiffs against Moseley and Doherty)**

141.    Plaintiffs re-allege and incorporate paragraphs 1-139.

142.    The Fourteenth Amendment to the U.S. Constitution protects Plaintiffs' right to privacy.

143.    Indeed, the Court of Appeals for the Seventh Circuit recognizes the constitutional right to the privacy of medical information and other information of a nature that people are reluctant to disclose to strangers. *Wolfe v. Schaefer*, 619 F.3d 782, 783 (7th Cir. 2010).

144.    Defendants used their positions of power and trust to invade and violate Plaintiffs' constitutional right to privacy.

145.    Plaintiffs have a fundamental federally protected interest in keeping their confidential medical information about mental health issues private, as well as other categories of personal information that people are "reluctant to disclose to strangers." *Wolfe*, 619 F.3d at 785.

146.    Defendant Moseley intruded upon her players' privacy rights by trapping them in intense one-on-one meetings in which she pressured them to divulge confidential mental health symptoms and treatment choices.

147.    In these meetings, Defendant Moseley also intrusively probed into other aspects most would consider deeply personal and would be reluctant to disclose, such as sensitive information about romantic partners or information about relationships with family members.

148.    Defendant Moseley additionally pressured her players, including but not limited to Plaintiffs Ellew and Towers, to sign agreements authorizing the release of all medical and mental health records to the University under threat of removal from the team.

149.    There was no significant governmental interest in access to and dissemination of this information. Specifically, there was no significant governmental interest in access to and dissemination of mental health information upon penalty of Plaintiffs' dismissal from the team. Such interest was also lacking as it pertained to information about private relationships with romantic partners, or about personal relationships with family that a person would be reluctant to disclose to a stranger.

150.    The actions of Defendants Doherty and Moseley, in addition to being intentional and malicious, were arbitrary and irrational.

151.    The unjustified forced disclosure of Plaintiffs' constitutionally protected health, romantic, and other information by Defendant Moseley violated Plaintiffs' substantive due process privacy rights under the Constitution of the United States.

152.    Defendant Doherty knew, ratified, and took no action to remedy Defendant Moseley's requirement that players disclose their private health information, a further violation.

153.    Defendants were acting under the color of law and in the scope of their employment at the time they took the aforementioned actions.

154.     Defendants' actions caused Plaintiffs damages, including but not limited to severe and permanent emotional distress with physical manifestations, and damages resulting from loss of educational opportunities, loss of a scholarship, and loss of future career and coaching prospects.

155. Defendants acted maliciously toward the Plaintiffs, or in an intentional disregard of their rights.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – First Amendment Retaliation**
**(Alleged by Duckett, Ellew, Ferrito, Stauffacher, and Towersagainst Moseley and Doherty)**

156.    Plaintiffs re-allege and incorporate paragraphs 1-154.

157.    Defendant Moseley violated Plaintiffs' rights under the First Amendment by threatening their participation in athletics, playing time, and their scholarships and opportunities for degrees, based on their choices to disclose, or not disclose, details about certain aspects of their life—constitutionally protected speech—during intense, regular, and required one-on-one meetings in Moseley's office.

158.    During these meetings, Moseley demanded that Plaintiffs disclose their confidential

37

mental health symptoms and treatment choices, information about their romantic partners, and information about their families, upon threat of reprisal.

159.     Defendant Moseley followed through on these threats. For example, Plaintiff Alexis Duckett was forced to disclose personal information about her then-boyfriend and relationship with her father. When Plaintiff Duckett began sharing less about these topics with Moseley, Moseley retaliated against her based on her speech and reduced her playing time.

160.     Plaintiff Duckett experienced significant retaliation for her protected speech in other ways. After Plaintiff Duckett began to amass a public presence in connection with the NCAA's changes to name, image, and likeness ("NIL") rules, Moseley instructed Plaintiff Duckett to make her social media accounts private. When Ms. Duckett refused, Moseley retaliated by harassing and belittling Ms. Duckett, telling her that her "ass was getting too small."

161.     When Ms. Duckett requested a medical discharge from the team based upon knee surgeries and concussions, Defendant Moseley denied this request despite Defendant Doherty's approval. Defendant Doherty then pressured Ms. Duckett to sign a form indicating that she was leaving the program voluntarily, which would lead her to forfeit her scholarship. This retaliation led to Ms. Duckett signing the form after significant pressure, for her own well-being.

162.     Moseley's and Doherty's retaliatory actions ultimately cost Ms. Duckett a college degree.

163.     Defendant Moseley additionally pressured her players, including but not limited to Plaintiffs Ellew and Towers, to sign agreements authorizing the release of all medical and mental health records to the University under threat of removal from the team, explicit retaliation based upon Plaintiffs' choice to speak, or not speak, on the subject, protected expressive activity under the First Amendment.

38

164.    Defendant Moseley also retaliated against Plaintiff Ferrito for her speech choices. Specifically, when a teammate had a severe mental health crisis, Defendant Moseley berated Plaintiff Ferrito for not contacting her prior to calling emergency first response services, threatening that her future on the basketball team would be in jeopardy based upon this expressive act and any future speech like it.

165.    Defendant Moseley also reprimanded Plaintiff Ferrito for the expressive acts of choosing to visit and bring clothes and a book to a mental health facility for a teammate.

166.    Defendant Moseley further berated Plaintiff Ferrito for the First Amendment-protected activity of showing care and kindness when a teammate tore her ACL, eventually telling Ms. Ferrito that she was "never going to play [at UW-Madison]," leading to Ferrito's departure from UW-Madison.

167.    Defendant Moseley also retaliated against Plaintiff Stauffacher for her "air-fiving" her parents in the stands before games. Moseley taunted Ms. Stauffacher, threatening her playing time, and further told Ms. Stauffacher to stop talking to her parents. By cutting off Ms. Stauffacher's healthy support systems outside the team, a form of psychological abuse, Ms. Stauffacher suffered severe and continuing emotional distress.

168.    The speech and expressive acts by Plaintiffs were constitutionally protected First Amendment activity.

169.    The adverse actions of Defendant Moseley towards her players were made in retaliation for Plaintiffs' First Amendment-protected speech choices. Plaintiffs' protected speech was the substantial and motivating factor for the Defendants' retaliatory actions, which came suspiciously close in time to all of the protected speech at issue.

170.    The adverse actions by Defendants would likely deter Plaintiffs from exercising

constitutionally protected speech in the future with regard to mental health, romantic relationships, and familial relationships; relationships with teammates; expressive activity on social media or during games; and in other fora, and would also chill potential constitutionally protected speech of other players participating in UW-Madison athletic programming.

171.    At all relevant times, Defendants were aware that Plaintiffs were engaged in constitutionally protected speech when they violated their rights.

172.    Defendants Moseley and Doherty were acting under the color of law and in the scope of their employment at the time of the constitutional violations.

173.    Defendants' actions caused Plaintiffs damages, including but not limited to severe and permanent emotional distress with physical manifestations, and also damages resulting from loss of educational opportunities, loss of a scholarship, and loss of future career and coaching prospects.

174.    Defendants acted maliciously toward the Plaintiffs, or in an intentional disregard of their rights.

## THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Violation of Equal Protection - Disability
### (Alleged by all Plaintiffs against Moseley and Doherty)

175.    Plaintiffs re-allege and incorporate paragraphs 1-173.

176.    The Fourteenth Amendment to the United States Constitution, enforceable under 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

177.    This count pleads a disability-based discrimination Equal Protection claim.

178.    Defendants Moseley and Doherty intentionally treated disabled plaintiffs differently from similarly situated individuals and did so while motivated by a discriminatory

purpose, with no rational basis for these actions.

179.    The differential treatment was based upon impermissible considerations, and this discrimination was not rationally related to a legitimate state interest.

180.    Defendant Moseley used her role as a coach to discriminate based on disability by making threats about Plaintiffs' scholarships and playing time.

181.    Defendant Moseley, for example, coerced players, following a mental health incident, to sign broad agreements releasing their medical records if they wished to remain on the team. She did not do the same for similarly situated players without mental health conditions.

182.    Further, Defendant Moseley trapped Plaintiff Krystyna Ellew in a locker room for the majority of a day and interfered with her mental health treatment during a mental health event. Defendant Moseley, while keeping Plaintiff Ellew captive, threatened to involve the police until the player agreed to check into a mental health treatment facility. Moseley is not a qualified mental health provider.

183.    Similarly situated athletes, both on the women's basketball team and in other sports, were not limited in their ability to pursue collegiate athletics and were not and are not targeted for reprisal based upon their lack of disabilities, unlike Plaintiffs.

184.    All Plaintiffs have disabilities or were perceived by Defendants to have disabilities.

185.    Further, Plaintiff Tessa Towers was open with Moseley and the University about her ADHD diagnosis. As required by NCAA policies, she shared her diagnosis and medications, but instead of accommodating this disability or treating Plaintiff Towers akin to similarly situated individuals, Moseley ultimately forced Plaintiff Towers off the team in 2024 in retaliation for sharing this information about her disability.

186.    Plaintiff Towers was also forced—by Defendants Doherty and Moseley—to sign a

document setting forth behavioral expectations that were impossible for Ms. Towers to meet because the University failed to provide appropriate accommodations for her disability, and instead, singled her out for discipline *based* on her disabilities. This discriminatory document was signed by only Ms. Towers and Defendants Moseley and Doherty—no medical or disability services personnel were involved.

187.    During her tenure, Defendant Moseley also approached the coach of Plaintiff Towers' then-girlfriend, who was a student-athlete at UW–Madison, and expressed negative views about Plaintiff Towers upon information and belief based on her disability. These concerns were later echoed to Plaintiff Towers' then-girlfriend by the same coach.

188.    Moseley's actions towards Plaintiff Towers were particularly egregious as they pertained to Plaintiff Towers' medication. With Moseley's direction and/or consent, Ms. Towers was taken off her ADHD medication and instead given 11 new medications in less than a year. These medications had side effects, but Plaintiff Towers was denied reasonable accommodations or modifications to get through the transition.

189.    Plaintiff Towers' condition deteriorated as a result of this course of action, particularly as a result of Moseley's targeting and berating her during practices. This caused a significant deterioration of Plaintiff Towers' mental health, leading to self-harm and hospitalization.

190.    Moseley isolated Plaintiff Towers—instead of working with disability services— by threatening other players not to be friends with or visit her at the hospital.

191.    Moseley eventually placed Plaintiff Towers on a "3 strikes" plan as a result of her disability, a condition not placed upon similarly situated individuals.

192.    Moseley also punished Plaintiff Towers and Plaintiff Ellew for their mental health

conditions, prohibiting them from attending the team trip while similarly situated individuals were allowed to attend.

193.    Moseley also responded to Plaintiff Ellew's concerns about mental health medication by insisting that Ellew continue taking medications that she did not want to take as a condition of her being "consistent on the team."

194.    Moseley also abused her position of authority by inappropriately targeting Plaintiff Tessa Grady, whom she perceived as disabled, telling and told her to get tested for ADHD.

195.    Moseley's general disdain towards players' actual or perceived mental disabilities was also reflected by her blanket statement to the team that being "in one's head" is a "made up thing and not real."

196.    Defendant Doherty was aware of Moseley's discriminatory abuse via reports from players and parents, but nonetheless sanctioned and condoned Defendant Moseley's actions.

197.    Defendants actions were motivated by either discriminatory purpose, irrationality unrelated to legitimate state interests, or both. Their actions to treat Plaintiffs disparately on the basis of their disabilities violated Plaintiffs' Fourteenth Amendment rights of equal protection guaranteed under the U.S. Constitution, and thus violating their rights enforceable under 42 U.S.C. § 1983.

198.    Defendants Moseley and Doherty treated Plaintiffs, and other disabled athletes on the team who are not plaintiffs, differently from others similarly situated, and did so with discriminatory purpose.

199.    Defendants were acting under color of law and in the scope of their employment at the times of the constitutional violations.

200.    Defendants' actions caused Plaintiffs damages, including but not limited to severe

43

and permanent emotional distress with physical manifestations, and also damages resulting from loss of educational opportunities, loss of a scholarship, and loss of future career and coaching prospects.

## FOURTH CLAIM FOR RELIEF
### 42. U.S.C. § 1983 – Failure to Intervene
### (Alleged by all Plaintiffs against Doherty)

201.    Plaintiffs re-allege and incorporate paragraphs 1-197.

202.    Defendant Doherty was present, aware, able to assist, and yet failed to intervene to stop Moseley's violations of Plaintiffs' First and Fourteenth Amendment Rights.

203.    Defendant Doherty had a reasonable opportunity to intervene and prevent the violations of health privacy and informational privacy, equal protection, and First Amendment retaliation based on the protected expressive activity of Plaintiffs but failed to take even the most basic action to stop the violations of Plaintiffs' rights.

204.    Defendant Doherty was acting under the color of state law and in the scope of his employment at the time of these constitutional violations.

205.    Defendant's actions caused Plaintiffs damages, including but not limited to severe and permanent emotional distress with physical manifestations, and also damages resulting from loss of educational opportunities, loss of a scholarship, and loss of future career and coaching prospects.

206.    Defendant Doherty acted maliciously toward the Plaintiffs, or in an intentional disregard of their rights.

## FIFTH CLAIM FOR RELIEF
### Section 504 of the Rehabilitation Act - 29 U.S.C. §794
### (intentional discrimination; failure to provide reasonable modification; disparate impact)
### (Alleged by all Plaintiffs against UW Regents)

207.    Plaintiffs re-allege and incorporate paragraphs 1-203.

44

208.    Section 504 of the Rehabilitation Act provides that "[]no otherwise qualified individual with a disability in the United States... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance..." 29 U.S.C. §794.

209.    Section 504 requires covered entities to provide reasonable accommodation or modification to enable qualified individuals with disabilities to participate in a program or activity.

210.    Defendant is subject to the Rehabilitation Act as employees of an entity of state government—a public education institution—that receives federal financial assistance. 29 U.S.C. § 794(b)(2)(A); 49 C.F.R. §27.1.

211.    Plaintiffs are qualified individuals with disabilities pursuant to Section 504 because they have mental health conditions that can impede major life activities or were perceived to have disabilities.

212.    By failing to provide Plaintiffs with the reasonable accommodations or modifications and otherwise discriminating against them and denying them the benefit of public services, programs, and/or activities, Defendants discriminated against Plaintiffs in violation of Section 504.

213.    For example, Plaintiff Tessa Towers was open with Moseley and the University about her ADHD diagnosis but was discriminated against and denied reasonable accommodation or modification, exacerbating and harming her mental health. Plaintiff Towers was ultimately forced off the team in 2024 because of her disability. Plaintiff Towers was additionally forced by Defendants to change her medications rather than accommodating her existing medication regime, leading to a course of 11 new prescriptions within a year and associated negative consequences.

214.    Plaintiff Towers was also forced—by Defendants Doherty and Moseley—to sign a

document setting forth behavioral expectations that were impossible for Ms. Towers to meet because the University failed to provide appropriate accommodations for her disability, and instead, singled her out for discipline *based* on her disabilities. This discriminatory document was signed by only Ms. Towers and Defendants Moseley and Doherty—no medical or disability services personnel were involved.

215.    For further example, Plaintiff Ellew was, instead of being provided proper care, trapped in a locker room under threat of police involvement by Defendant Moseley.

216.    Defendants' conduct was intentional and deliberately indifferent to Plaintiffs' federally protected rights. Defendant Moseley, *inter alia*, forced Plaintiffs to share private information regarding mental health during intense and repeated 1 on 1 meetings in her office; trapped Plaintiff Ellew in the locker room during a mental health event associated with her disability under threat of police involvement until she took the medical course of action required by Moseley; manipulated disabled players into sharing immensely personal and vulnerable information in a group setting; forced Plaintiffs Ellew, Ferrito, Duckett, and Towers to disclose information about mental health, romantic relationships, sexual relationships, and family relationships; prohibited Plaintiffs Ellew and Towers from joining team trips based upon speech and disability; forced Plaintiff Duckett onto mental health medications she did not want in response to disclosure of a disability; placed Plaintiff Towers on a "3 strikes" plan in response to her disability; and forced Plaintiff Towers to sign a punitive agreement that could not be met due to the University's lack of accommodations for her disabilities, instead singling out her for discipline.

217.    Moseley also, for example, responded to Plaintiff Ellew's concerns about mental health medication by insisting that Ms. Ellew continue taking medications that she did not want to take as a condition of her being "consistent on the team." Similarly, Moseley abused her position

of authority by inappropriately telling Plaintiff Tessa Grady, whom she perceived as disabled, to get tested for ADHD.

218.    Further, Plaintiff Towers was open with Moseley and the University about her ADHD diagnosis. Plaintiff Towers was ultimately forced off the team in 2024 in retaliation for her sharing of this information about her disability.

219.    Moseley also approached the coach of Plaintiff Towers' then-girlfriend, who was an athlete at UW–Madison, and expressed negative views about Plaintiff Towers upon information and belief based upon her disability. These concerns were then echoed to Plaintiff Towers' then-girlfriend by the same coach.

220.    Further, Defendant Moseley trapped Plaintiff Ellew in a locker room for the majority of the day and interfered with her mental health treatment during a mental health event. Defendant Moseley, while keeping Plaintiff Ellew captive, threatened to involve the police until the player agreed to check into a mental health treatment facility.

221.    Moseley also pressured Plaintiff Duckett to take prescription medication for stress and anxiety that Duckett reported to her under duress, despite Plaintiff Duckett's insistence that she did not want to take medication.

222.    Accommodations or modifications for Plaintiffs would not fundamentally alter the nature of the University of Wisconsin sports programming nor create undue financial or administrative burdens on the University or its sports programming.

223.    The denied accommodations do not change an essential aspect of the game of basketball, nor does it give disabled players an advantage that fundamentally alters the character of the competition.

224.    The need for modifications was known, or should have been known, to Defendants.

225.    Defendants' conduct also disparately impacted the disabled Plaintiffs as opposed to players without disabilities, and as opposed to participants in other Division I sports at UW Madison.

226.    As outlined elsewhere herein, Defendants treated Plaintiffs, qualifying individuals under the Rehabilitation Act, differently from non-disabled individuals, using punishment, threats, and coercion to make their lives miserable as opposed to accommodating disabilities or otherwise ensuring access to federally funded programs or activities (i.e., University of Wisconsin Madison programs or activities, including inter-collegiate sports).

227.    Specifically, by taking the abusive, retaliatory, punitive, and completely unnecessary actions against Plaintiffs described herein, Defendants deprived Plaintiffs of meaningful access to the benefits, programming, and activities that the University of Wisconsin and its athletic programs offer. This denial constitutes a disparate impact on the disabled Plaintiffs.

228.    On multiple occasions, players and plaintiffs with disabilities suffered from reprisal in their participation in sports, seeing reduced playing time. Several players left the team because of this denial of access to federal protections, programming, and activities. Indeed, Plaintiff Duckett lost her scholarship and opportunity for a college degree because of this state of affairs.

229.    But for their disabilities, Plaintiffs would have had greater opportunities to play, study, thrive, and experience a healthy and supportive collegiate athletics and collegiate experience.

230.    Defendants' conduct was intentional and deliberately indifferent to Plaintiffs' federally protected rights.

231.    Defendants' actions caused Plaintiffs damages, including but not limited to severe and permanent emotional distress with physical manifestations, and also damages resulting from

loss of educational opportunities, loss of a scholarship, and loss of future career and coaching prospects.

## SIXTH CLAIM FOR RELIEF
### Americans with Disabilities Act
### (Retaliation, Denial of Reasonable Accommodations)
### (Alleged by Duckett, Ellew, Ferrito, Stauffacher, and Towers against UW Regents)

232.    Plaintiffs re-allege and incorporate paragraphs 1-228.

233.    Plaintiffs are qualified individuals with disabilities, or were perceived by Defendants to have disabilities, under the Act.  They meet the essential eligibility requirements for the receipt of services or participation in programs or activities provided by a public entity, here, college athletics. *See* 42 U.S.C § 12131.

234.    Under the ADA,  "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132.

235.    The ADA requires public entities to provide reasonable accommodations to qualified individuals with disabilities to enable them to benefit from the service and participate in the program or activity.

236.    Additionally, the ADA prohibits a qualified individual with a disability, *by reason of such disability*, from being excluded from participation or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

237.    Plaintiffs are further qualified persons with disabilities pursuant to the ADA because they suffer from mental illnesses that impede their ability to access and undertake major life activities or were perceived by defendants as suffering from disabilities that impeded their ability to access or undertake major life activities.

238.    By failing to provide Plaintiffs with the reasonable accommodations or

modifications and otherwise discriminating against them and denying them the benefit of public services, programs, and/or activities, Defendants discriminated against Plaintiffs in violation of the ADA.

239.    Defendants a) failed to provide reasonable accommodations to Plaintiffs; b) excluded Plaintiffs from participation in and/or denied the benefits of programs, services, or activities of the University of Wisconsin-Madison; and c) discriminated against Plaintiffs by virtue of their disabilities.

240.    First, Defendants failed to provide reasonable accommodations or modifications to Plaintiffs.

241.    Specifically, and without limitation, Defendants, in lieu of allowing Plaintiff Towers from continuing her existing ADHD medication, forced her onto 11 medications within a year, denying her the accommodation of taking the medication of her choice.

242.    Also, Defendant Moseley, who is not a qualified mental health professional, trapped Plaintiff Ellew in a locker room under threat of police involvement until she agreed to check into a residential mental health facility. In doing so, Moseley ignored alternative treatment options that could have accommodated Ellew's disability, the symptoms of which were both exacerbated and caused by Defendants' actions.

243.    Further, Defendant Moseley denied all students the accommodation of eschewing intense, invasive, and unnecessary one-on-one meetings with her; during these meetings, Moseley pried and pressured students to reveal intimate details of their lives, exacerbating their disabilities.

244.    Also, Defendant Moseley and Defendant Doherty refused Plaintiff Duckett a medical withdrawal following multiple concussions and other injuries, a constructive denial of accommodation of a disability leading to the constructive forfeiture of a college degree at the

University.

245.    Accommodations for Plaintiffs would not fundamentally alter the nature of the University's sports programming nor create undue financial or administrative burdens on the University or its sports programming.

246.    The denied accommodations do not change an essential aspect of the game of basketball, nor does it give disabled players an advantage that fundamentally alters the character of the competition.

247.    The need for modifications was known, or should have been known, to Defendants.

248.    By failing to provide Plaintiffs with reasonable accommodations for their disabilities, for which the need was evident, Defendants discriminated against Plaintiffs in violation of Title II of the Americans with Disabilities Act.

249.    Second, Defendants excluded Plaintiffs from participation in and/or denied the benefits of UW programs, services, or activities. Defendants limited Plaintiffs' playing time based upon their disabilities and further denied certain Plaintiffs the ability to go on a team trip based upon their disabilities.

250.    Third and finally, Defendants explicitly discriminated against Plaintiffs by virtue of their disabilities by, without limitation, contacting loved ones or authority figures in their lives with negative comments about Plaintiffs; forcing medication on Plaintiffs who did not want it; trapping a Plaintiff in a locker room during a mental health episode; preventing Plaintiffs from interacting with teammates; preventing Plaintiffs Ellew and Towers from joining a team trip; attempting to limit Plaintiff Ferrito's ability to access loved ones experiencing disabling events at the hospital; and placing Plaintiff Towers on a "3-strikes" plan in response to her disability in addition to forcing her to sign a punitive agreement setting forth conduct rules based upon her

disability.

251.    Defendants' conduct denied Plaintiffs the benefits of participating in UW athletics and other aspects of campus life.

252.    Defendants' conduct was intentional and deliberately indifferent to Plaintiffs' federally protected rights.

253.    UW Regents receives federal funding to support the University of Wisconsin System.

254.    Defendants' actions caused Plaintiffs damages, including but not limited to severe and permanent emotional distress with physical manifestations, and also damages resulting from loss of educational opportunities, loss of a scholarship, and loss of future career and coaching prospects.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Alexis Duckett, Krystyna Ellew, Mary Ferrito, Tessa, Grady, Tara Stauffacher, and Tessa Towers pray for judgment in their favor and against Defendants as follows:

a.  Declaring that the actions of Defendants were in violation of the First Amendment and Fourteenth Amendment of the United States Constitution, Title II of the Americans with Disabilities Act, and Section 509 of the Rehabilitation Act of 1973;

b.  For compensatory damages in an amount to be determined;

c.  For punitive damages in an amount to be determined;

d.  For an award of Plaintiffs' actual, reasonable attorney fees, pursuant to 42 U.S.C. § 1988;

e.  For an award of costs and disbursements incurred in bringing this action;

f.  For an award of pre-judgment and post-judgment interest; and

g.  For such further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to F.R.C.P. 38, Plaintiffs demand trial by jury in this action on all issues triable by a jury.

Dated this 25th day of September, 2025.

Respectfully submitted,

**DOLAN LAW OFFICES, P.C.**

_Electronically Signed by Martin A. Dolan_
Martin A. Dolan
10 South LaSalle Street, Suite 3702
Chicago, Illinois 60603
(312) 676-7600
mdolan@dolanlegal.com

**FUHRMAN & DODGE, S.C.**

_Electronically Signed by Christopher J. Dodge_
Christopher J. Dodge
State Bar No. 1011530
Noe J. Rincon
State Bar No. 1124893
Jeanne M. Armstrong
State Bar No. 1021451
6405 Century Avenue, Suite 101
Middleton, WI 53562
Phone: 608-327-4200 Fax: 608-841-1502
cdodge@fuhrmandodge.com
nrincon@fuhrmandodge.com
jarmstrong@fuhrmandodge.com

_Counsel for Plaintiffs_