IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ALEXIS DUCKETT, KRYSTYNA ELLEW, MARY FERRITO, TARA STAUFFACHER, TESSA TOWERS, and TESSA GRADY,

Plaintiffs,

v.

THE BOARD OF REGENTS OF THE UNIVERSITY OF WISCONSIN SYSTEM, JUSTIN DOHERTY, and MARISA MOSELEY,

Defendants.

OPINION and ORDER

25-cv-684-jdp

---

The University of Wisconsin–Madison hired Marisa Moseley as the head coach of the women's basketball team in 2021, following a decade of losing seasons.[1] The team improved somewhat, and in 2024 it made its first postseason appearance since 2010. But after four losing seasons, Moseley stepped down in 2025.[2] There was trouble off the court, too.

Plaintiffs in this case are six of Moseley's former players. They allege that Moseley pried into and interfered with their personal lives, cut their playing time for disobeying Moseley, discriminated against them based on their mental health conditions, and generally demeaned and psychologically abused them. Plaintiffs contend that Moseley's conduct violated their rights under the First and Fourteenth Amendments, the Americans with Disabilities Act (ADA)

---

[1] *Wisconsin Hires Marisa Moseley as Women's Basketball Coach*, Associated Press (Mar. 26, 2021, at 22:11 CDT), https://apnews.com/article/womens-basketball-womens-college-basketball-basketball-wisconsin-geno-auriemma-1bc99c153184f2351b4bd5d6a9a22b5e.

[2] *Wisconsin's Marisa Moseley Stepping Down After Fourth Straight Losing Season*, Associated Press (Mar. 9, 2025, at 20:09 CDT), https://apnews.com/article/wisconsin-badgers-4f008469c27c3aa2f6a94089c7eebd2c.

and the Rehabilitation Act. Plaintiffs also contend that defendant Justin Doherty, one of the athletic directors, is liable because he knew about the violations of their rights and let them continue. Defendants move to dismiss the amended complaint for failure to state a claim. Dkt. 9.

Plaintiffs' allegations raise serious questions about the wisdom and effectiveness of some of Moseley's coaching methods. Plaintiffs depict a coach who was excessively controlling of even the most minute aspects of their lives, who did not respect plaintiffs' privacy on even the most intimate matters, who interfered with their medical care, and who bullied and mocked them about mental health symptoms. If these allegations are true, one reasonable inference is that Moseley was a bad coach with a seriously misguided view of team cohesion. And perhaps the allegations could support state-law tort claims for invading plaintiffs' privacy or intentionally inflicting emotional distress on them. But plaintiffs did not assert any state-law claims, and a violation of federal law requires more than allegations of harsh and intrusive coaching.

A public employee may be held liable for constitutional violations only if that employee violated clearly established law. A state university may be held liable for violating federal disability statutes only if a student was denied meaningful access to a state program because of a disability. Plaintiffs' own allegations show that plaintiffs have not met either standard. Plaintiffs identify *no* law setting forth constitutional limits on a college coach's invasion of an athlete's privacy, attempts to restrict an athlete's speech, or control over an athlete's mental health. The allegations in the amended complaint provide grounds for criticizing many of Moseley's coaching decisions, but the complaint does not identify conduct that is so severe that any reasonable coach would know that she is violating the Constitution. Plaintiffs also do

not identify any way they were denied meaningful access to a state program because of any disability.

Under these circumstances, federal law cannot provide any remedy for plaintiffs' injuries. The court will dismiss the amended complaint for failure to state a claim for relief and close the case.

## PRELIMINARY ISSUES

Before summarizing the factual allegations, the court identifies two problems with the amended complaint. First, the complaint was difficult to follow because it was poorly organized and included numerous extraneous allegations. Federal Rule of Civil Procedure 8 requires plaintiffs to "make their pleadings straightforward, so that judges and adverse parties need not try to fish a gold coin from a bucket of mud." *U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003). Plaintiffs did not follow this rule. The amended complaint contains 261 paragraphs spanning 53 pages. As presented, the allegations do not fit nicely into a coherent, chronological narrative; the complaint jumps back and forth in time and among the six plaintiffs, often repeating similar allegations, without providing context that would be helpful to fully understand what plaintiffs are alleging.

What's worse, it is not clear how many of the allegations are related to plaintiffs' claims. For example, there are numerous allegations regarding alleged verbal harassment and other adverse actions by Moseley, but many of those allegations are not directly tied to any claims discussed in plaintiffs' brief. So those allegations simply distract from the claims that were asserted. The court has disregarded any allegations that are not clearly identified in plaintiffs' brief as the basis for one or more of their claims.

Second, plaintiffs often use legalistic conclusions to characterize their allegations. For example, plaintiffs repeatedly describe Moseley's actions as "psychological abuse." Dkt. 5, ¶¶ 1, 17, 36, 51, 66, 70, 96, 105, 107–09, 129, 136, 142, 167. On a motion to dismiss, plaintiffs' factual allegations are presumed true. But the court does not accept factual or legal conclusions or characterizations. *Ashcroft v. Iqbal*, 556 U.S. 662, 680–81 (2009); *Prudential Ins. Co. of Am. v. Sipula*, 776 F.2d 157, 159 (7th Cir. 1985). A characterization of conduct as "abuse" is a conclusion with no factual content, so the court disregarded such characterizations.

## ALLEGATIONS OF FACT

The court draws the following allegations from plaintiffs' amended complaint.

Moseley coached UW-Madison's women's basketball team for four years, from 2021 to 2025. Doherty was the senior associate athletic director for external communications during this time.

Six students who played for Moseley at UW are plaintiffs in this case. The court will summarize each student's allegations.

### A. Alexis Duckett

Alexis Duckett played for Moseley during the 2021–22 season. During one-on-one meetings, Moseley forced Duckett to talk about her relationship with her then-boyfriend and her fraught relationship with her father.

Moseley repeatedly questioned Duckett about her mental health. Moseley told Duckett to go on prescription medication for her mental health, even though Duckett had told Moseley that she did not want to be medicated.

Duckett began to avoid Moseley's office and share less about her personal life. An assistant coach told Duckett that Moseley reduced her playing time because of her attempts to distance herself from Moseley.

In 2021, the National Collegiate Athletic Association (NCAA) implemented a policy that allowed student-athletes to monetize their name, image, and likeness.[3] Duckett's following on social media began to grow. Moseley instructed her to make her social media profiles private because Moseley did not like "external influences." Dkt. 5, ¶ 92. Duckett refused. Afterwards, Moseley told Duckett that "her ass was getting too small," referred her to a sports nutritionist, and required her to sit next to a team trainer during meals so that the trainer could pick what she could eat and ensure that she ate everything on her plate. *Id*. Duckett started having panic attacks.

**B. Tara Stauffacher**

Tara Stauffacher played for Moseley during the 2021–22 season. Before her basketball games, Stauffacher would "air-high-five" her parents in the stands. During one game, Moseley ordered Stauffacher to stop this practice. Moseley told Stauffacher that she should stop talking to her parents because Moseley made decisions about playing time, not Stauffacher's parents. At halftime during the same game, Moseley told Stauffacher in front of the rest of the team that she should stop talking with her parents because they would not help her with her position on the team. Stauffacher began to distance herself from her parents.

[3] Michelle Brutlag Hosick, *NCAA Adopts Interim Name, Image and Likeness Policy*, NCAA (June 30, 2021, at 04:20 p.m.), https://www.ncaa.org/news/2021/6/30/ncaa-adopts-interim-name-image-and-likeness-policy.aspx.

Stauffacher still suffers panic attacks, flashbacks, and anxiety from her experiences with Moseley.

**C. Krystyna Ellew**

Krystyna Ellew played for Moseley during the 2021–22 and 2022–23 seasons. During one-on-one meetings, Moseley forced Ellew to talk about her romantic relationships and her relationship with her family. Ellew believed that she had to share this information to get playing time. Ellew's mental health began to deteriorate.

One night, Moseley told Ellew that she needed to go to a mental health treatment facility; if she refused, then Moseley would call the police. Ellew went to the treatment facility but left one day later after she consulted with her health providers. Upon Ellew's return to UW–Madison, Moseley took her to a back room in the women's locker and put up a sign to prevent others from entering the room. Ellew told Moseley that she felt trapped and wanted to leave the room. Moseley refused. Moseley gave Ellew two chairs to use as a bed and told Ellew that she would call the police if Ellew tried to leave.

Ellew returned to the treatment facility. After being released, Ellew took medication for her mental health. Ellew complained to Moseley about the medication's side effects, but Moseley told her to keep taking it, stating: "[T]he longer it takes for you to get consistent on medications, the longer it will take for you to be consistent on the team." Dkt. 5, ¶ 74.

At some point, Moseley pressured Ellew to sign an agreement authorizing the release of her medical records to the university. Moseley told Ellew that if she refused to sign the agreement, then she would be removed from the team. (Plaintiffs do not say whether Ellew signed the release.) Moseley also prohibited Ellew from attending a team trip because of her mental health. (Plaintiffs do not say what the trip was for.)

**D. Mary Ferrito**

Mary Ferrito played for Moseley during the 2022–23 season. Moseley yelled at Ferrito during a basketball game because Ferrito wiped mascara from the face of her teammate, who had been crying because she tore her ACL.

After Ferrito called emergency services for a friend experiencing a mental health crisis, Moseley told Ferrito that "her future on the basketball team would be in jeopardy" because she did not contact Moseley first. Dkt. 5, ¶ 169.

During one-on-one meetings, Moseley forced Ferrito to talk about her friendship with her roommate, who was struggling with mental health issues, and pressured Ferrito to distance herself from her roommate. Moseley also ordered Ferrito not to visit her roommate at the treatment facility. Ferrito visited anyway, and Moseley reprimanded her for doing so.

Ferrito began to have anxiety, panic attacks, and insomnia. Ferrito ultimately transferred to another school after Moseley told her that she "was never going to play here." Dkt. 5, at 28.

**E. Tessa Towers**

Tessa Towers played for Moseley during the 2022–23 and 2023–24 seasons. Towers has attention deficit hyperactivity disorder (ADHD). Over the course of a year, UW–Madison medical providers put her on 11 different medications. Towers experienced side effects from the medications.

Moseley yelled at Towers during practices, which overstimulated her and triggered her ADHD symptoms. Towers's mental health worsened; she was twice hospitalized for self-harm.

Moseley put Towers on a performance-improvement plan; if Towers violated the plan three times, she would be removed from the team and would lose her scholarship. Towers

incurred one strike by submitting late a document outlining her goals. Moseley told Towers that she thought the anxiety that the plan caused Towers would be good for her during the season.

Moseley prohibited Towers from attending a team trip because of her mental health. (Again, plaintiffs do not say what the trip was for.)

At some point, Moseley pressured Towers to authorize the release of her medical records to the university, or she would be removed from the team. (Again, plaintiffs do not say whether Towers signed the release.) During Mosley's one-on-one meetings with Towers, Moseley forced Towers to talk about her physical relationships; for example, Moseley asked Towers whether she was having sex with her then-girlfriend.

### F. Tessa Grady

Tessa Grady played for Moseley during the 2023–24 season. Moseley told Grady that she should get tested for ADHD. During one-on-one meetings, Moseley forced Grady to talk about her relationship with her girlfriend, who also played on the team, including whether they argued. Moseley would stop basketball practice to separate Grady and her girlfriend if they stood near one another. Grady began to have frequent panic attacks, insomnia, and severe anxiety.

The court will discuss additional allegations as they become relevant to the analysis.

## ANALYSIS

Plaintiffs assert several constitutional and statutory claims against the three defendants, but the main ones are their constitutional claims against Moseley. Defendants move to dismiss

plaintiffs' amended complaint under Federal Rule of Civil Procedure 12(b)(6), contending that it fails to state any claim for relief.

Rule 12(b)(6) requires a plaintiff to plead facts from which the court can reasonably infer that the defendant is liable for the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This means that she must include sufficient details to "present a story that holds together" under the relevant law. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). At the motion-to-dismiss stage, the court accepts the allegations as true and resolves all reasonable inferences in the plaintiff's favor. *Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873, 878 (7th Cir. 2022).

A motion to dismiss under Rule 12(b)(6) also tests a complaint's legal sufficiency. *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806 (7th Cir. 2020). A complaint is legally insufficient if it "lacks the support of a cognizable legal theory." *Pub. Int. Legal Found., Inc. v. Wolfe*, 187 F.4th 981, 987 (7th Cir. 2026). Dismissal is therefore proper if the allegations in the plaintiff's complaint, "however true, could not raise a claim of entitlement to relief." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 558 (2007).

Defendants also move to dismiss Duckett and Stauffacher's claims as barred by the statute of limitations. *See* Dkt. 10, at 8–13. The court begins with that issue, before turning to the merits of plaintiffs' constitutional and statutory claims.

**A. Statute-of-limitations issue**

Defendants contend that Duckett and Stauffacher must be dismissed as plaintiffs because their claims are barred by the statute of limitations. Duckett and Stauffacher bring claims under 42 U.S.C. § 1983, the ADA, and the Rehabilitation Act, which require plaintiffs to bring claims within three years after they have accrued. Wis. Stat. § 893.53; *see Ghelf v. Town*

*of Wheatland*, 132 F.4th 456, 469 (7th Cir. 2025) (forum state's statute of limitations for personal injury actions governs § 1983 claims); *Soignier v. Am. Bd. of Plastic Surgery*, 92 F.3d 547, 551 n.3 (7th Cir. 1996) (same for ADA); *Bush v. Commw. Edison Co.*, 990 F.2d 928, 933 (7th Cir. 1993) (same for Rehabilitation Act).

Defendants' argument is that Duckett and Stauffacher allege that they played for Moseley during the 2021–22 season only, and this case was not filed until August 2025, more than three years after the season ended, so their claims are untimely. Plaintiffs concede that Duckett and Stauffacher did not play for Moseley after the 2021–22 season.

One potential wrinkle is that the complaint does not specify when the season ended. Generally, a court may not dismiss a claim as untimely unless it is clear from the face of the complaint that the defense applies. *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). But there is an exception to the general rule: the court may also consider facts that are subject to judicial notice. *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). Plaintiffs do not dispute that the court can take judicial notice of the fact that the season ended in April 2022.[4] Plaintiffs also do not contend that any of the allegations in the amended complaint about Duckett and Stauffacher are about conduct occurring after April 2022. Instead, plaintiffs say it is possible that defendants committed additional acts—not alleged in the amended complaint—after April 2022.

[4] *South Carolina Wins 2022 DI Women's Basketball National Championship*, NCAA (Apr. 3, 2022), https://www.ncaa.com/live-updates/basketball-women/d1/south-carolina-wins-2022-diwomens-basketball-national-championship (showing that women's championship was in April). The court may take judicial notice of reports of administrative bodies such as the National Collegiate Athletic Association (NCAA).

This argument fails. It is true that plaintiffs are not required to plead facts to overcome affirmative defenses such as the statute of limitations. *NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 299 (7th Cir. 2018). But plaintiffs *do* need to provide the defendants with notice of their claims, so if plaintiffs believed that defendants violated Duckett and Stauffacher's rights after the season ended, they needed to identify the alleged conduct in their amended complaint. *See E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 781 (7th Cir. 2007) (complaint must identify the defendant's unlawful conduct). Even in their brief, plaintiffs do not identify what this other conduct might be. In fact, they do not allege that either Duckett or Stauffacher had any contact with Moseley after the end of the season. So it is clear from the face of the complaint and the facts subject to judicial notice that Duckett and Stauffacher's claims are untimely.

Plaintiffs also ask the court to apply the continuing violation doctrine, which can extend the statute of limitations when there are repeated acts of misconduct. But even under the continuing violation doctrine, there must be at least one violation occurring within the limitations period. *Moore v. Burge*, 771 F.3d 444, 446–47 (7th Cir. 2014). As already discussed, plaintiffs have not identified any conduct occurring within the limitations period.

The court will dismiss Duckett and Stauffacher's claims as barred by the statute of limitations. But even if Duckett and Stauffacher's claims were not time-barred, those claims would fail on the merits, as the court will discuss below.

### B. Constitutional claims

Plaintiffs contend that Moseley violated their constitutional rights in three ways: (1) she forced them to reveal personal information, in violation of the Fourteenth Amendment's Due Process Clause; (2) she retaliated against them because of their speech, in

violation of the First Amendment; and (3) she treated them adversely because of their mental health conditions, in violation of the Fourteenth Amendment's Equal Protection Clause. The court will consider each of these contentions in turn.

Defendants contend both that plaintiffs do not state a claim for a constitutional violation and that defendants are entitled to qualified immunity on the constitutional claims. Under the doctrine of qualified immunity, public employees cannot be sued for damages on alleged constitutional violations unless the defendants' alleged conduct violated clearly established law. *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Once a defendant raises the issue of qualified immunity, it is the plaintiff's burden to show that qualified immunity does not apply. *See Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019). A plaintiff meets this burden by pointing to either: (1) a closely analogous, binding case decided in her favor; or (2) a more general constitutional rule that applies "with obvious clarity" to the defendant's conduct. *Cibulka v. City of Madison*, 992 F.3d 633, 639–40 (7th Cir. 2021). A more general constitutional rule applies with obvious clarity if "a reasonable person necessarily would have recognized it as a violation of the law." *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017). If a plaintiff fails to meet this burden, then the court must dismiss her claim under Rule 12(b)(6). *Hanson v. LeVan*, 967 F.3d 584, 590 (7th Cir. 2020).

**1. Substantive due process claims**

Plaintiffs contend that Moseley violated their right to due process by requiring them to disclose personal information to her. They rely on a line of cases holding that state actors may not arbitrarily or irrationally deprive individuals of fundamental rights or liberties, regardless of the procedures used. *See Campos v. Cook Cnty.*, 932 F.3d 972, 975 (7th Cir. 2019). Such claims have two elements: (1) the defendant's conduct violated a fundamental right or liberty;

and (2) the conduct was so arbitrary and irrational that it shocks the conscience. *Nelson v. City of Chicago*, 992 F.3d 599, 604 (7th Cir. 2021). Plaintiffs' claims fail on the first element, so it is unnecessary to consider the second.

To determine whether an asserted right is sufficiently fundamental, courts apply the two-step inquiry established in *Washington v. Glucksberg*, 521 U.S. 702 (1997). At the first step, a plaintiff must carefully describe her asserted liberty interest. 521 U.S. at 721. At the second step, a plaintiff must demonstrate that her asserted liberty interest is "deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id*. (cleaned up).

Plaintiffs do not apply the two-step analysis in their brief. Instead, they contend that Moseley violated their fundamental right to informational privacy, relying on *Whalen v. Roe*, 429 U.S. 589 (1977), in which the Court indicated that there might be a liberty interest in "avoiding disclosure of personal matters." 429 U.S. at 599. They also cite the Seventh Circuit's decision in *Wolfe v. Schaefer*, 619 F.3d 782 (7th Cir. 2010), in which the Seventh Circuit observed that the courts of appeals have interpreted *Whalen* to "recognize a constitutional right to the privacy of medical, sexual, financial, and perhaps other categories of highly personal information—information that most people are reluctant to disclose to strangers." 619 F.3d at 785.

Plaintiffs' argument is foreclosed by *Doe 1 v. Sloan*, 172 F.4th 955 (7th Cir. 2026). The court held that neither *Whalen* nor *Wolfe* establishes that a right to informational privacy is sufficiently fundamental because those cases "offer only broad observations about 'privacy'" and do not "engag[e] in the careful historical analysis required." *Id.* at 960. Whatever right

plaintiffs might have to informational privacy, they have not cited any authorities showing that it is so fundamental as to support a substantive due process claim.

Like the court of appeals in *Sloan*, this court does not minimize "the seriousness of plaintiffs' allegations and the real harm that [Moseley] caused." *Id.* But "[n]ot every wrong is a constitutional one," and the court cannot expand the Due Process Clause to accommodate a sympathetic plaintiff. *See id.*

Even if *Sloan* is not the last word on the subject, that case shows that there is no clearly established right to informational privacy under the Due Process Clause, so Moseley is entitled to qualified immunity. Because plaintiffs fail to state viable claims against Moseley, the court need not address whether they have stated claims against Doherty for failing to intervene.

**2. First Amendment claims**

Most of the plaintiffs raise two types of First Amendment claims against Moseley. First, they contend that Moseley retaliated against them for speaking or refusing to speak. Second, they contend that Moseley forced them to speak on certain matters. Tessa Grady does not assert a First Amendment claim. Dkt. 5, at 37. Doherty is listed as a defendant in the amended complaint on the First Amendment retaliation claim, but plaintiffs say nothing about that claim against him in their brief, so they have forfeited that claim.

Plaintiffs' First Amendment claims have multiple problems. First, plaintiffs are vague regarding what conduct they believe qualifies as expressive. Plaintiffs devote one sentence in their brief to this issue, stating that they engaged in expressive conduct by "calling emergency services and visiting teammates in the hospital; caring for players on the court; 'air fiving' their parents; and by speaking or declining to speak during invasive team meetings; and resisting or questioning invasive medical authorizations." Dkt. 17, at 20. Plaintiffs do not even attempt to

explain how all of this conduct "possesses sufficient communicative elements to bring the First Amendment into play." *Texas v. Johnson*, 491 U.S. 397, 404 (1989).

Second, the only adverse conduct plaintiffs identify for some of the speech is that Moseley "berate[d]" them or made vague threats against them that were never fulfilled.[5] It is well established that harsh criticism does not violate the First Amendment. *Deeren v. Anderson*, 72 F.4th 229, 235–36 (7th Cir. 2023); *see also Wand v. Boughton,* No. 19-cv-927-wmc, 2021 WL 1784640, at *4 (W.D. Wis. May 5, 2021) ("Courts often reject retaliation claims based solely on incidents of verbal harassment or other insufficiently adverse conduct."). This principle likely applies with even greater force in the coaching context, where harsh talk is common and expected.

Third, plaintiffs do not include plausible allegations regarding how some of the alleged retaliation is related to any expressive conduct. For example, plaintiffs allege that Moseley tried to control Duckett's diet to retaliate against her for refusing to keep her social media profiles private. Dkt. 5, ¶ 92. But plaintiffs provide no basis for inferring that the two issues are connected in any way. Rather, plaintiffs' own allegations suggest that Moseley thought that Duckett was too thin. *Id.* Even at the pleading stage, plaintiffs must provide a plausible basis for inferring retaliation. *See Emerson v. Dart*, 109 F.4th 936, 941–42 (7th Cir. 2024).

---

[5] *See*, *e.g.*, Dkt. 5, ¶ 66 (Moseley "mock[ed]" Stauffacher for "air-fiving" her parents before games); *id.* ¶ 78 (Moseley "berated" Ferrito for not contacting Moseley before calling emergency services for a teammate experiencing a mental health crisis and "warning that if she failed to report any future incidents directly to Moseley before notifying anyone else, her future on the basketball team would be in jeopardy"); *id.* ¶ 102 (Moseley "yell[ed] cruelly" at Ferrito after helping an injured teammate); *id.* ¶ 160 (Moseley told Duckett her "ass was getting too small"); *id.* ¶ 165 (Moseley "reprimanded" Ferrito for visiting a teammate at a mental health facility).

The broader problem common to all aspects of the First Amendment claims is that plaintiffs have not shown that any of Moseley's alleged conduct violates clearly established law. It is true that qualified immunity is often resolved in the context of a motion for summary judgment rather than a motion to dismiss. *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019). But the "Supreme Court repeatedly has stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 915–16 (7th Cir. 2015) (*quoting Saucier v. Katz*, 533 U.S. 194, 201 (2001), and *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). This is because qualified immunity provides an immunity from suit; it is not simply a defense to liability. *Saucier*, 533 U.S. at 201. So there is no rule against applying qualified immunity at the pleading stage. In fact, the court of appeals has reversed a district court's refusal to apply qualified immunity on a motion to dismiss when it was appropriate. *Doe*, 782 F.3d at 916–17 (collecting cases). This is one of those appropriate cases.

To begin with, even the legal standard to apply is unclear. There is no case from the Supreme Court or the Court of Appeals for the Seventh Circuit deciding the scope of a student-athlete's free speech rights to defy her coach. This reason alone strongly supports the application of qualified immunity.

Plaintiffs ask the court to apply *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), in which the Court held that a student's speech is protected unless it would "materially and substantially disrupt the work and discipline of the school." Defendants propose a standard that bears some similarity to the one applied to public employees, which asks whether the employee spoke as a private citizen on a matter of public concern, and whether the employee's interest in speaking is outweighed by the interest of the

government employer in promoting effective and efficient public service. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006); *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968); *Connick v. Myers*, 461 U.S. 138, 147 (1983).[6]

The dispute is understandable. College student-athletes are obviously students, but they represent the university more than a typical student. They have more duties that they perform on behalf of the university. Some of them may even receive compensation. *See National Collegiate Athletic Association v. Alston*, 594 U.S. 69, 107 (2021). So there is a plausible argument that a standard similar to the one for public employees should apply. If it did, plaintiffs' retaliation claims would necessarily fail because plaintiffs do not cite any authority supporting a conclusion that any of the speech at issue in this case was a matter of public concern.

But even if plaintiffs are treated as students, it does not follow necessarily that *Tinker* applies. The Supreme Court has applied different tests to students, depending on the context. For example, a school does not have to show any likelihood of disruption before censoring a student's "lewd and indecent" speech or speech promoting drug use, regardless of whether the speech was disruptive. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986) (lewd speech); *Morse v. Frederick*, 551 U.S. 393, 397 (2007) (speech promoting illegal drug use). And

---

[6] Defendants propose the following standard:

> Speech made by collegiate student athletes in the context of their sport or their team, that primarily advances personal interests, that does not reasonably involve political, social, religious, or other subjects of broad interest or value to the public, is not protected unless the coach and/or university officials responded to the speech by issuing punishment that was patently unreasonable or outside the scope of their official duties.

Dkt. 10, at 39.

student speech that "bear[s] the imprimatur of the school" can be censored if doing so is "reasonably related to legitimate pedagogical concerns." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). *Kuhlmeier* also teaches more generally that any test regarding student speech must be applied "in light of the special characteristics of the school environment." 484 U.S. at 266; *see also N.J. by Jacob v. Sonnabend,* 37 F.4th 412, 426 (7th Cir. 2022) ("The application of *Tinker* must account for . . . any factors particular to the educational environment.").[7] The important point of all these cases is that the First Amendment rights of a student are heavily dependent on context.

The First Amendment standard to apply in the coaching context is not obvious from the above case law, especially in the context of college sports. A team has characteristics that a class does not. Generally, a team is a more cohesive unit. The coach exercises greater control over an athlete than a teacher does over a student. The relationship is more personal, so the line between personal matters and matters related to the team is less defined. And the athlete is participating in an extracurricular activity that she signed up for. The Supreme Court recognized this when it observed that student-athletes "voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995). All of this suggests that courts must apply great care before concluding that a coach's efforts to manage the team violate the First Amendment, even when the coach's conduct seems unwise or excessive.

[7] In *Mahanoy Area School District v. B. L. by and through Levy*, 594 U.S. 180, 180–81 (2021), the Court held that a school's authority to censor a student's speech is "diminished" when the speech occurs off campus. Plaintiffs do not contend that any of their speech occurred off campus, and they do not rely on *Mahanoy* for any purpose, so it is unnecessary to consider that case.

Even in cases in which the court applied *Tinker*, student-athletes have rarely fared well when they are asserting a right under the First Amendment to oppose or defy their coach. In *Lowery v. Euverard*, 497 F.3d 584 (6th Cir. 2007), the court concluded that a high school football coach did not violate the First Amendment rights of players who circulated a petition alleging that he "struck a player in the helmet, threw away college recruiting letters to disfavored players, humiliated and degraded players, used inappropriate language, and required a year-round conditioning program in violation of high school rules." *Id.* at 585. The court reasoned that the "ability of the coach to lead is inextricably linked to his ability to maintain order and discipline . . . . [and] attacking the authority of the coach necessarily undermines his ability to lead the team." *Id.* at 594.

And in *Wildman ex rel. Wildman v. Marshalltown School District*, 249 F.3d 768, 770 (8th Cir. 2001), the court concluded that a high school basketball coach did not violate student-athletes' First Amendment rights when he cut players who circulated a letter stating that "some of us should be playing Varsity or even JV" and suggesting that they "give him back some of the bullshit that he has given us." The court reasoned that the letter was insubordinate and defiant, so it would have materially disrupted the team's cohesiveness. *Id.* at 772.

*Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755 (9th Cir. 2006), was a split decision. The court concluded that an athlete boycott of a high school basketball game was not protected because it interfered with and disrupted a school activity. *Id.* at 769-70. But the school could not suspend the students simply because they signed a petition complaining about verbal harassment by the coach. *Id.* at 760.

The greatest support in the case law is for student-athlete whistleblowers who report serious misconduct by the coach, especially if that misconduct bears little relation to coaching

duties. For example, in *Seamons v. Snow*, 84 F.3d 1226 (10th Cir. 1996), the court held that a high school football coach could not cut a player for reporting to school administrators that teammates bound him in the locker room, taped his genital area with athletic tape, and brought a girl he had dated into the locker room while teammates watched. *Id.* at 1230; *see also B.L. ex rel. Levy*, 594 U.S. at 210 (Alito, J., concurring) ("[A] coach could not discriminate against a student for blowing the whistle on serious misconduct."); *Lowery,* 497 F.3d at 600 (distinguishing cases involving a "whistleblower situation, where players were disciplined for reporting improprieties").

In this case, plaintiffs allege that Moseley retaliated against them for refusing to disclose information that she believed she needed to "build trust," for failing to contact her about mental health emergencies, for refusing to keep a social media profile private, talking to people during games, and associating with people that she believed were bad influences. In sum, all of plaintiffs' allegations are about their attempts to defy Moseley directly.

None of the above cases clearly establish that plaintiffs had a right to defy their coach under the circumstances of this case. If there is any clearly established principle in the case law, it is that coaches cannot retaliate against athletes for whistleblowing about serious misconduct. Plaintiffs in this case allege that some of them complained to Doherty about Moseley, but most of the allegations are vague, and it is not clear whether any of the plaintiffs were still on the team when they complained. *See* Dkt. 5, ¶¶ 125–142. Regardless, none of the plaintiffs allege that Moseley retaliated against them for any of their complaints to Doherty, so cases such as *Seamons* are not instructive.

Plaintiffs cite several other cases, but none of them provide guidance. *Healy v. James*, 408 U.S. 169 (1972), *West Viriginia State Board of Education v. Barnette*, 319 U.S. 624 (1943),

*Perry v. Sindermann*, 408 U.S. 593 (1972), and *McGill v. Board of Education of Pekin Elementary School Dist. No. 108*, 602 F.2d 774 (7th Cir. 1979), have nothing to do with student-athletes or coaching. *Healy* is about the right of college students to receive university recognition for a student-led group. *Barnette* is about the right of students to remain silent during the Pledge of Allegiance. *McGill* and *Perry* are not even about students; rather, they are about the First Amendment rights of teachers. Plaintiffs rely on these cases for broad principles about speech in the school setting. But an asserted right is not clearly established unless it is "specific to the relevant factual context of a cited case and not generalized with respect to the Amendment that is the basis of the claim." *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008).

Plaintiffs also cite two district court cases, including this court's decision in *Whalen v. MacKenzie*, No. 24-cv-342-jdp, 760 F. Supp. 3d 743 (W.D. Wis. 2024), as well as *Beverly v. Watson*, No. 14 C 4970, 2017 WL 4339795, at *1 (N.D. Ill. Sept. 29, 2017). District court cases "have no weight as precedents and therefore cannot *clearly* establish a constitutional right." *Boyd v. Owen*, 481 F.3d 520, 527 (7th Cir. 2007). Regardless, neither case is instructive. *Whalen* was primarily about the speech of a student's father, not a student. The only student speech at issue was a complaint to the principal that the coach was retaliating against him because of his father's speech. There was no insubordination by a student. *Beverly* was about censorship of a professor's speech.

This leaves the question whether Moseley's conduct obviously violated the First Amendment under more general principles. *Cibulka*, 992 F.3d at 639–40. Plaintiffs cannot show that it did.

Plaintiffs have raised fair questions about the necessity and wisdom of many of Moseley's actions. Many would likely view the control Moseley exerted over plaintiffs as

extreme. It is questionable whether Moseley needed to know intimate details of plaintiffs' sex lives to establish trust or whether "air-high-fiving" a parent before a game undermined Moseley's authority. But even plaintiffs acknowledge that Moseley's attempt to control their speech was part of Moseley's desire to establish a cohesive team that was not distracted by outside influences. So the question raised by plaintiffs' First Amendment claims is this: at what point does harsh coaching cross the line into unconstitutional suppression of speech? There is simply no clear answer to that question in the case law. That lack of clarity is fatal to plaintiffs' First Amendment claims.

Both sides suggest that the alleged instances of compelled speech (such as conversations about personal lives and medical disclosures) may be governed by a different test. But if that is correct, Moseley is entitled to qualified immunity on those claims as well. The only cases plaintiffs cite about compelled speech involve situations in which the plaintiff was required to adopt a message the plaintiff disagreed with. *See 303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) (support for same-sex marriage); *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557 (1995) (support for LGBT people); *Barnette*, 319 U.S. 624 (support for the ideas in the Pledge of Allegiance). That is not the type of compelled speech at issue in this case. Rather, the forced disclosures in this case are about truthful information that plaintiffs did not want to share.

The Supreme Court has applied less scrutiny to forced disclosures of factual information. *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U. S. 47, 63–64 (2006). Plaintiffs cite no cases in which *any* court held or even considered whether a coach violated the First Amendment by prying into the private lives of student-athletes. So even if

Moseley's conduct seems intrusive and unjustified, the court cannot say that it violated clearly established law.

In their brief, plaintiffs say that Moseley forced them to agree with her statement that she "didn't want to hear that 'I was in my head' b******t anymore' because being in your head is a made-up thing and it's not real." Dkt. 5, ¶ 92. But that is inconsistent with the allegations in the complaint, which say nothing about any efforts by Moseley to force plaintiffs to say those things. Rather, the amended complaint alleges that Moseley was expressing her own viewpoint. One could view Moseley's statement as an attempt to stop plaintiffs from complaining, but that would not violate clearly established law either, for all the reasons discussed in this section.

The court will dismiss plaintiffs' First Amendment claims as barred by the doctrine of qualified immunity.

**3. Equal protection claims**

Plaintiffs contend that Moseley violated the Equal Protection Clause by discriminating against them because they have mental health disabilities, and that Doherty failed to intervene. Defendants deny that plaintiffs have alleged that they are disabled, but the court will assume that they are for the purpose of their equal protection claims.

As with the First Amendment claims, plaintiffs devote little space in their brief to explaining what specific conduct by Moseley they believe violated the Equal Protection Clause, instead citing generally to dozens of allegations in the amended complaint. Dkt. 17, at 32–33. Plaintiffs say that they do not have to identify similarly situated persons who were treated more favorably, but that misses the point. They do need to provide fair notice of their claims,

and that includes identifying the conduct they allege to be discriminatory. *Concentra Health Servs.*, 496 F.3d at 781.

In their opening brief, defendants rely on plaintiffs' summary of their equal protection claims at the end of the amended complaint. Dkt. 5, ¶¶ 181–195. Plaintiffs do not take issue with that summary or contend in their brief that it is incomplete, so the court will rely on it as well. That summary challenges the following conduct:

- requiring plaintiffs to release their medical records without requiring the same of players who did not have mental health conditions;
- requiring Ellew to remain in the locker room until she agreed to check into a mental health facility;
- placing Towers on a "behavioral expectations plan";
- making negative comments to and about Towers because of her ADHD;
- failing to provide Towers with reasonable accommodations and forcing her off the team after she experienced side effects from her ADHD medication;
- prohibiting Towers and Ellew from attending a team trip because of their mental health conditions;
- requiring Ellew to take mental health medications that she did not want to take so that she would be "consistent on the team";
- telling Grady to get tested for ADHD.

Some of these allegations fail at the outset. As already discussed, criticism and negative comments do not state a claim under the Constitution. *Chavez v. Illinois State Police*, 251 F.3d 612, 646 (7th Cir. 2001); *DeWalt v. Carter*, 224 F.3d 607, 612 n. 3 (7th Cir. 2000). And there is no requirement under the Equal Protection Clause to provide accommodations for people with disabilities. *See Bd. of Trs. of Univ. of Alabama v. Garrett*, 531 U.S. 356, 367 (2001).

As for the remaining claims, the court will assume that plaintiffs have alleged that Moseley treated them less favorably because of a mental health disability. But that is only the first question. The remaining question is whether that treatment violates the Equal Protection Clause.

People with disabilities are not a suspect class entitled to heightened protection, *United States v. Harris*, 197 F.3d 870, 876 (7th Cir. 1999), so disability discrimination violates the Equal Protection Clause only if the discrimination is not rationally related to any legitimate interest, *see Heller v. Doe ex rel. Doe*, 509 U.S. 312, 320 (1993); *Ostrowski v. Lake Cnty.*, 33 F.4th 960, 966 (7th Cir. 2022). State officials also may rely on an individual's disability "as a proxy for other qualities, abilities, or characteristics that are relevant to the State's legitimate interests." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84 (2000).

Courts presume that distinctions based on disability are rational and legitimate. *Stevens v. Ill. Dep't of Transp.*, 210 F.3d 732, 738 (7th Cir. 2000). At the pleading stage, a plaintiff must allege facts sufficient to overcome this presumption. *See Ruiz v. Pritzker*, 162 F.4th 886, 890 (7th Cir. 2025). This means that a plaintiff must negate "every conceivable" rational basis that might support the challenged state action. *Turner v. Glickman*, 207 F.3d 419, 424 (7th Cir. 2000); *see Ruiz v. Pritzker*, 162 F.4th 886, 890 (7th Cir. 2025). "If [the court] can come up with a rational basis for the challenged action, that will be the end of the matter—animus or no." *Fares Pawn, LLC v. Ind. Dep't of Fin. Insts.*, 755 F.3d 839, 845 (7th Cir. 2014). This is "a heavy legal lift" for plaintiffs, *Indiana Petroleum Marketers & Convenience Store Ass'n v. Cook*, 808 F.3d 318, 322 (7th Cir. 2015), which is why equal protection challenges under rational-basis review are rarely successful.

Plaintiffs contend that the presumption of rationality applies only to so-called "class of one" claims that do not involve discrimination against an identifiable group. But that is incorrect. In fact, the Supreme Court has applied that presumption in the context of considering claims brought by individuals with mental disabilities. *See Heller*, 509 U.S. at 320 ("[T]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.").

Plaintiffs' equal protection claims fail because plaintiffs have not overcome the presumption that Moseley's conduct had a rational basis. Plaintiffs' allegations against Moseley can be divided into three categories: (1) insisting that plaintiffs receive treatment for their mental health conditions; (2) imposing requirements that she believed were necessary to address challenges caused by mental health conditions; and (3) excluding plaintiffs when she believed that their mental health conditions were undermining their performance. This alleged conduct could be fairly characterized as many things: unfair, unkind, insensitive, intrusive, harsh. But the court cannot say that the conduct was irrational, which is a low barz. It is not irrational to want student-athletes to receive treatment for mental health conditions and to believe that individuals suffering from mental health conditions need additional structure. It is also not irrational to believe that individuals currently suffering from mental health symptoms will be less effective players, even if that might be unfair. As head coach, it was Moseley's responsibility to ensure that UW–Madison's women's basketball team was in the best position to win. Moseley's alleged methods for achieving that goal can be criticized on many levels. But that does not make her conduct irrational or unconstitutional.

The court concludes that none of the plaintiffs have stated a claim against Moseley under the Equal Protection Clause. This makes it unnecessary to consider qualified immunity or whether Doherty failed to intervene. The court will dismiss the equal protection claim.

**C. Statutory disability discrimination claims**

Plaintiffs also bring statutory claims against The Board of Regents. All plaintiffs except Grady contend that the Board of Regents violated the Americans with Disabilities Act (ADA). All plaintiffs contend that the Board of Regents violated the Rehabilitation Act.

A threshold issue is whether plaintiffs' ADA claims are barred by the doctrine of sovereign immunity, which prevents states from being sued for damages without their consent. *Garrett*, 531 U.S. at 363. Section 12202 of the ADA purports to abrogate sovereign immunity for ADA claims, but it remains an open question whether that abrogation was pursuant to a valid grant of constitutional authority. *Jaros v. Illinois Dept. of Corrections*, 684 F.3d 667 (7th Cir. 2012) (calling the issue a "thorny question"). In *United States v. Georgia*, the Supreme Court held that sovereign immunity is abrogated under Title II of the ADA when the challenged conduct also violates the Fourteenth Amendment. 546 U.S. 151, 159 (2006); *see also McDaniel v. Syed*, 115 F.4th 805, 821 (7th Cir. 2024) (discussing *Georgia*). But the Court in *Georgia* explicitly declined to decide whether sovereign immunity is abrogated when the challenged conduct violates the ADA but not the Fourteenth Amendment. *Id.*

Plaintiffs contend that their claims survive under *Georgia* because they "plausibly allege conduct that independently violates the Fourteenth Amendment, including substantive due process violations of their right to privacy as to their personal and confidential medical information and Equal Protection violations." Dkt. 17, at 40. That argument fails: the court has already decided that plaintiffs failed to state a claim under the Fourteenth Amendment.

Plaintiffs did not make any other argument against applying sovereign immunity to the ADA claims, so they have forfeited the issue. *See Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1078 (7th Cir. 2016). The court will dismiss the ADA claims on sovereign immunity grounds.

That leaves the Rehabilitation Act claims, which are not subject to a sovereign immunity defense. Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance" 29 U.S.C. § 794(a). A Rehabilitation Act claim has four elements: (1) the plaintiff was disabled; (2) the plaintiff was "otherwise qualified" to participate in the program at issue; (3) the program receives federal financial assistance; and (4) the plaintiff was "denied the benefits of the program solely because of her [disability]." *Lewis v. Ind. Dep't of Transp.*, 173 F.4th 876, 882 (7th Cir. 2026) (citation omitted). Defendants challenge the first and fourth elements.[8]

**1. Individuals with disabilities**

A plaintiff is an "individual with a disability" under the Rehabilitation Act if she has a physical or mental impairment that "substantially limits one or more major life activities," has a record of such an impairment, or is regarded as having such an impairment. 29 U.S.C. § 705(20)(B). "Major life activities" are the basic functions of life, "such as caring for oneself,

[8] Defendants also contend that plaintiffs cannot recover damages for emotional distress or punitive damages under the Rehabilitation Act. But defendants do not contend that any of the plaintiffs fail to state a claim because they have not alleged any relief to which they may be entitled. "A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015). So any arguments about limitations of damages are premature.

performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Knapp v. N.W. U.*, 101 F.3d 473, 479 (7th Cir. 1996) (quoting 34 C.F.R. § 104.3(j)(2)(ii) and 45 C.F.R. § 84.3(j)(2)(ii)).

In this case, it is not plausible to infer that most of the plaintiffs are disabled under the above standard. Plaintiffs do not allege that Stauffacher suffered from any mental health difficulties. Most of the plaintiffs allege that they experienced mental health symptoms, but symptoms alone are not enough; plaintiffs must tie those symptoms to a medical disorder or condition. *See Richardson v. Chicago Transit Auth*., 926 F.3d 881, 891 (7th Cir. 2019); *Krocka v. City of Chicago*, 203 F.3d 507, 512–13 (7th Cir. 2000). Towers alleges that she has ADHD, but a diagnosis does not in and of itself show disability either. *See Burnett v. LFW Inc*., 472 F.3d 471, 483 (7th Cir. 2006); *Branham v. Snow*, 392 F.3d 896, 903 (7th Cir. 2004); *see also Nadolski v. Assocs. in Sleep Med., Inc.,* 160 F. Supp. 3d 1051, 1057 (N.D. Ill. 2016) (ADHD diagnosis does not establish disability).[9] Rather, it must be plausible to infer that plaintiffs suffered from a mental impairment that substantially limited a major life activity or was regarded to do so. *See Krocka*, 203 F.3d at 512–13; *Homeyer v. Stanley Tulchin Associates, Inc.*, 91 F.3d 959, 961

[9] Plaintiffs cite *Brandon v. Bd. of Educ. of the City of Chi*., 384 F. Supp. 3d 781, 788–89 (N.D. Ill. 2019), for the proposition that an allegation of ADHD is enough to show disability at the pleading stage. But defendants pointed out in their reply brief that the cited case does not exist. In response, plaintiffs acknowledge that they used artificial intelligence to help conduct research, and they withdraw the citation. Dkt. 19. Plaintiffs also withdraw reliance on a quotation to *Payan v. L.A. Cmty. Coll. Dist*., 11 F.4th 729, 737–38 (9th Cir. 2021), that they admit does not exist. The use of AI is not prohibited in this circuit, but the court of appeals recently reminded lawyers practicing here that "[a]ccuracy and honesty matter," so counsel have a duty under the federal rules to "read their filings and take reasonable care to avoid misrepresentations, factual and legal" that AI research might produce. *Jones v. Kankakee Cnty. Sheriff's Dep't*, 164 F.4th 967, 969–71 (7th Cir. 2026). Plaintiffs' counsel failed to do that in the case. The court expects plaintiffs' counsel to do better the next time they litigate in this court.

(7th Cir. 1996). Most of the plaintiffs have not done this. Rather, they say only that their symptoms affected their ability to play intercollegiate basketball. But basketball is not a major life activity. *Knapp*, 101 F.3d at 480.

Grady is the only possible exception. Plaintiffs allege that Moseley met with Grady about a poor grade she had received in freshman math and told her that she should be tested for ADHD. Dkt. 5, ¶ 91. From this, it might be plausible to infer that Moseley regarded Grady as having a mental impairment (ADHD) that substantially limited the major life activity of learning. But even if Grady or any of the other plaintiffs suffered from a disability, their Rehabilitation Act claims fail for other reasons, as the court will discuss next.

**2. Denial of the benefits of a program or activity because of disability**

One of the elements of a Rehabilitation Act claim is that the plaintiff was excluded from, denied the benefits of, or subjected to discrimination in a program, service, or activity because of a disability. *See* 29 U.S.C. § 794(a). A plaintiff can establish the denial-of-benefits element via one of three theories. First, the plaintiff can show that the defendant intentionally acted on the basis of the disability (intentional discrimination theory). Second, the plaintiff can show that the defendant refused to provide a reasonable accommodation (reasonable accommodation theory). Third, the plaintiff can a show that the defendant has a rule, policy, or practice that disproportionally impacts disabled people (disparate impact theory). *A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 592–93 (7th Cir. 2018). Plaintiffs rely on each of these theories.

A threshold problem for this claim is the same as plaintiffs' other claims: plaintiffs do not clearly identify the actions they believe violated their rights. For example, they say that Moseley "targeted Plaintiffs based on actual or perceived mental health impairments and

subjected them to exclusion, discipline, and coercive control because of those impairments." Dkt. 17, at 39. The court has disregarded general assertions like these. Instead, the court will focus on the more specific contentions identified on pages 43 and 44 of plaintiffs' brief:

- Players were forced to receive unwanted treatment for mental health conditions. University officials switched Tessa Towers' ADHD medications against her will because they reduced her appetite and she needed to "bulk up." Dkt. 5, ¶ 84. Moseley pressured Alexis Duckett to take medication for stress and anxiety and told Krystyna Ellew to stay on medications so she could "be consistent on the team." *Id.* ¶¶ 217, 221. Moseley also trapped Ellew in a locker room until she agreed to check into a mental health facility. *Id.* ¶ 242.

- Moseley forced plaintiffs to share information about their mental health that they didn't want to disclose. *Id.* ¶ 216.

- Moseley triggered Towers's ADHD by yelling at her during basketball practice and disciplined her when she exhibited behaviors caused by ADHD, such as submitting a document one day late. *Id.* ¶ 89.

- Moseley denied Alexis Duckett a medical withdrawal from the basketball team even though athletic director Justin Doherty believed she qualified for one, which ultimately led her to voluntarily withdraw and forfeit her college scholarship. *Id.* ¶ 244.

- Moseley prohibited Ellew and Towers from attending a team trip because of their mental health. *Id.* ¶ 90.

Dkt. 17, at 43–44.[10]

None of these allegations support a plausible inference that plaintiffs were excluded, denied benefits, or discriminated against on the basketball team based on disability. The Rehabilitation Act requires defendants to provide meaningful access to people with disabilities; it does not require them to ensure equal outcomes for disabled and non-disabled individuals.

[10] Plaintiffs also point to their allegations that Moseley bullied Ferrito and Grady to the point that they experienced mental health symptoms such as panic attacks and insomnia. *See* Dkt. 5, ¶¶ 102–03, 91–92, 101. But it's not clear how those allegations could support disability claims. By plaintiffs' own account, Moseley's bullying preceded Ferrito and Grady's mental health symptoms, so her behavior could not have been discrimination on the basis of disability.

*See Alexander v. Choate*, 469 U.S. 287, 301–02 (1985). Plaintiffs' allegations that Moseley forced unwanted treatment on them, forced them to share information about their mental health, and yelled at them don't suggest that they were denied meaningful access to the basketball program. Plaintiffs say that Moseley's actions affected them emotionally in ways that may have been more intense for them than their non-disabled peers. But experiencing distress or anxiety as a result of a superior's behavior is not the same thing as being excluded from or otherwise denied the benefits of a program.[11]

Two allegations get closer to alleging denial of benefits. First, Duckett alleges that Moseley denied her a medical discharge from the basketball team, which ultimately led her to quit and forfeit her scholarship. Dkt. 5, ¶¶ 94–95. But plaintiffs do not allege that Moseley denied the medical discharge because Duckett was disabled. Rather, plaintiffs appear to be alleging the opposite: Duckett believed she was disabled, and Moseley denied the medical discharge because she disagreed. That is not discrimination based on disability.

Second, Ellew and Towers allege that Moseley prohibited them from attending a team trip because of their mental health. *Id.* ¶ 192. But Ellew and Towers don't provide details about the trip, and they don't explain what the trip was for or how the exclusion from the trip denied them meaningful access to the basketball program. But even if the trip qualified as a benefit, plaintiffs do not explain what they mean when they say that Moseley excluded them because of their "mental health." That matters, because Moseley's decision would violate the

[11] Some district courts have concluded that harassment so severe or pervasive as to alter the conditions of education can amount to effective exclusion from an educational program. *E.g.*, *Hagan v. City of Chicago Bd. of Educ.*, No. 1:25-CV-05807, 2026 WL 879760 (N.D. Ill. Mar. 30, 2026). But the Seventh Circuit has not yet recognized this "hostile learning environment" theory and plaintiffs did not raise it in their briefs, so the court need not consider it.

Rehabilitation Act only if the exclusion was based on stereotypes about their actual or perceived disabilities instead of how their symptoms were affecting their actual performance on the basketball team. *See Anderson v. Univ. of Wis.*, 841 F.2d 737, 740 (7th Cir. 1988). As alleged, it's not plausible that Moseley's decision was discriminatory exclusion as opposed to a bona fide coaching decision based on legitimate concerns about Ellew and Towers's ability to perform.

Plaintiffs' claims based on a failure-to-accommodate theory fail for an additional reason: plaintiffs haven't explained why they needed an accommodation to receive the benefits of playing basketball, or, if they did need an accommodation, what a reasonable accommodation would be. *See Brumfield v. City of Chicago*, 735 F.3d 619, 631 32 (7th Cir. 2013) (plaintiff must show that she needed an accommodation); *Riley v. Vilsack,* 665 F. Supp. 2d 994 (W.D. Wis. 2009) (dismissing reasonable-accommodation claim because plaintiff did not identify the accommodation he needed). Plaintiffs allege generally that the university failed to provide appropriate accommodations when Moseley's coaching style affected plaintiffs' mental health or when they were unable to meet Moseley's demanding expectations. *See* Dkt. 5, ¶¶ 124, 188. But the court is not required to accept conclusory allegations as true. *Brooks v. Ross,* 578 F.3d 574, 580–81 (7th Cir. 2009). The court cannot infer that the university failed to provide plaintiffs with reasonable accommodations when they themselves have not identified any accommodations.

That leaves plaintiffs' claims based on a disparate impact theory. To adequately allege a disparate impact claim, a plaintiff must identify a generally applicable policy, practice, or custom of the defendant that has the effect of denying individuals with disabilities meaningful access to a program or activity. *See Alexander*, 469 U.S. at 295–98; *A.B. ex rel. Kehoe v. Hous.*

*Auth. of S. Bend*, No. 3:11 CV 163 PPS, 2012 WL 1877740, at *6 (N.D. Ind. May 18, 2012). It's not enough for plaintiffs to point generally to statistical disparities between disabled and non-disabled players; they must isolate the specific practices that they say are responsible for the disparities. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 717 (7th Cir. 2012); *see also Smith v. City of Jackson,* 544 U.S. 228, 241 (2005) (holding that plaintiffs did not identify when they pointed generally to age disparities in defendant's pay plan but did not identify the specific part of the plan that adversely affected older workers).

Plaintiffs' disparate impact claims fail for two reasons. First, as the court already explained, plaintiffs have not alleged that they were denied meaningful access to the basketball team because of their disabilities. Second, plaintiffs did not identify any specific policy or practice that harmed players with disabilities. Plaintiffs say that they are challenging the practice of "participation and discipline requirements, along with mental health compliance expectations, [which] were applied across the team but operated in a manner that produced disproportionate exclusion and adverse consequences for athletes with disabilities." Dkt. 17, at 46. But that suggests that they're challenging essentially all of Moseley's behavior as a pattern or practice, which is far too generalized to support a disparate impact claim.

Plaintiffs' position appears to be that the university violated the Rehabilitation Act if plaintiffs experienced any sort of injury that was related in some way to a mental health symptom. That is not the law. The amended complaint does not contain any plausible allegations that the university discriminated against any of the plaintiffs in violation of the Rehabilitation Act, so the court will dismiss that claim.

CONCLUSION

The court has concluded that plaintiffs' complaint fails to state a plausible claim for relief under the Constitution, the ADA, or the Rehabilitation Act. The court has also concluded that Duckett and Stauffacher's claims are barred by the statute of limitations. Defendants' motion to dismiss under Rule 12(b)(6) will be granted.

The general rule is that courts should grant plaintiffs leave to amend their complaint before dismissing a complaint with prejudice. *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 943 (7th Cir. 2012). But there are exceptions to that rule. For example, when it is clear that amendment would be futile, granting leave to replead is not required. *Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013).

In this case, an amended complaint could not fix the defects with plaintiffs' constitutional claims. Plaintiffs' own allegations show that defendants did not violate their rights to substantive due process or equal protection or their clearly established rights under the First Amendment. An amendment to the ADA claims would also be futile because the court is dismissing that claim under the doctrine of sovereign immunity.

The problems with plaintiffs' claims under the Rehabilitation Act are less categorical. Plaintiffs' allegations do not conclusively show that it would be impossible for plaintiffs to allege additional facts that would state a claim under the Rehabilitation Act. Rather, the problem is that plaintiffs' allegations are so conclusory that it is not plausible to infer that plaintiffs could satisfy the elements of those claims. But this does not mean that plaintiffs are automatically entitled to try again. "Granting leave to amend is pointless when the plaintiff fails to suggest to the court the ways in which [she] might cure the defects." *Fosnight v. Jones*,

41 F.4th 916, 924–25 (7th Cir. 2022) (cleaned up). In that circumstance, dismissal with prejudice is appropriate. *Id.*

In this case, plaintiffs do not suggest that they could plead any additional facts to support their Rehabilitation Act claims. In fact, they do not ask for leave to amend if the court grants defendants' motion to dismiss. This is not surprising because the allegations have fundamental defects that would be difficult to fix. So the court concludes that granting leave to amend would be pointless, and the court will dismiss the case with prejudice.

ORDER

IT IS ORDERED that:

1. Defendants The Board of Regents of the University of Wisconsin System, Justin Doherty, and Marisa Moseley's motion to dismiss, Dkt. 9, is GRANTED.
2. The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered October 7, 2026.

BY THE COURT:

/s/

JAMES D. PETERSON
District Judge